[No. S016137. Dec. 24, 1990.]

ROBERT D. RAVEN et al., Petitioners, v.
GEORGE DEUKMEJIAN, as Governor, etc., et al., Respondents.

**COUNSEL**

Heller, Ehrman, White & McAuliffe, Stephen V. Bomse, David B. Goodwin, Melanie C. Gold, Katherine M. Basile and David C. Brownstein for Petitioners.

Linda F. Robertson, Henry H. Hall, Albert J. Menaster, John Hamilton Scott, John T. Philipsborn, Quin Denvir, Margaret C. Crosby, Alan L. Schlosser, Edward M. Chen, Matthew A. Coles, Paul Hoffman, Carol Sobel and Betty Wheeler as Amici Curiae on behalf of Petitioners.

Victor J. Westman, County Counsel, Andrea W. Cassidy, Deputy County Counsel, John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver, Laurence K. Sullivan, Morris Beatus and Clifford K. Thompson, Jr., Deputy Attorneys General, for Respondents.

John A. Slezak, Edward R. Jagels, District Attorney (Kern), Jeffrey T. Even, Deputy District Attorney, James P. Cloninger, Arlo Smith, District Attorney (San Francisco), Donald E. Sanchez, Assistant District Attorney, Thomas W. Sneddon, Jr., District Attorney (Santa Barbara), Gerald McC. Franklin, Deputy District Attorney, Kent S. Scheidegger, Charles L. Hobson, Tarkington, O'Connor & O'Neill, John D. O'Connor and Ross Johnson as Amici Curiae on behalf of Respondents.

OPINION

LUCAS, C. J.—

I. INTRODUCTION

In this proceeding, we consider challenges to the validity of an initiative measure adopted at the June 5, 1990, Primary Election. This measure, designated on the ballot as Proposition 115, is entitled by its framers as the "Crime Victims Justice Reform Act." Its stated general purpose is to adopt "comprehensive reforms . . . needed in order to restore balance and fairness to our criminal justice system." To achieve that purpose, the measure adopts a variety of changes and additions to our state Constitution and statutes.

Petitioners herein are taxpayers and voters asserting a challenge to the manner in which Proposition 115 was presented to the voters, and objecting to any further expenditure of funds to enforce or implement the measure. Specifically, petitioners (and several amici curiae supporting them) claim the measure violates both (1) the "single subject" rule embodied in our state Constitution (art. II, § 8, subd. (d)), and (2) the rule requiring constitutional "revisions" to be accomplished by more formal procedures than are contemplated for mere constitutional "amendments" (art. XVIII).

Respondents are certain public officials and courts charged with the responsibility of implementing, enforcing or applying the new measure. They too are supported by various amici curiae.

Although the present petition sought issuance of an original writ of mandate or prohibition from the Court of Appeal, we granted respondent Attorney General's motion to transfer the cause to this court. (See rule 20, Cal. Rules of Court.) ■ As we observed in a similar case, "It is uniformly agreed that the issues are of great public importance and should be resolved promptly. Accordingly, under well settled principles, it is appropriate that we exercise our original jurisdiction. [Citations.]" (*Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 241 [186 Cal.Rptr. 30, 651 P.2d 274] [hereafter *Brosnahan*], reviewing similar constitutional challenges to Prop. 8, "The Victims' Bill of Rights" initiative; see also *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281] [hereafter *Amador*], upholding Prop. 13, a property tax initiative.)

As in *Brosnahan*, the challenges presented here are directed to the manner in which the initiative measure was presented to the voters. We have no

occasion at this time to consider other possible attacks that may be directed at the various substantive and procedural changes accomplished by the measure. Similarly, except as necessary to resolve the basic questions before us, we do not consider in this case possible interpretive or analytical problems arising from the measure, including the retroactive application of all or part of its provisions. (Cf. *People* v. *Smith* (1983) 34 Cal.3d 251, 262-263 [193 Cal.Rptr. 692, 667 P.2d 149] [adopting prospective application for Prop. 8].)

■ *Brosnahan* succinctly set forth the general principles that must guide the courts in evaluating the validity of initiative measures: "Preliminarily, we stress that 'it is a fundamental precept of our law that, although the legislative power under our constitutional framework is firmly vested in the Legislature, "*the people* reserve to themselves the powers of initiative and referendum." (Cal. Const., art. IV, § 1.) It follows from this that, " '[the] power of initiative must be *liberally construed* . . . to promote the democratic process.' " [Citations.]' (*Amador*, [*supra*, 22 Cal.3d] at pp. 219-220, italics added [by *Brosnahan*].) Indeed, as we . . . acknowledged in *Amador*, it is our solemn duty jealously to guard the sovereign people's initiative power, 'it being one of the most precious rights of our democratic process.' (*Id.* at p. 248.) Consistent with prior precedent, *we are required to resolve any reasonable doubts in favor of the exercise of this precious right. (Ibid.* [italics in original].)" (*Brosnahan, supra*, 32 Cal.3d at p. 241; see also *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].)

As will appear, we have concluded that one provision of Proposition 115 (namely, section 3, which would amend section 24 of article I of the state Constitution) contemplates such a far-reaching change in our governmental framework as to amount to a qualitative constitutional revision, an undertaking beyond the reach of the initiative process. (See *Amador, supra*, 22 Cal.3d at p. 223.) Although we must invalidate that provision, the remaining sections of Proposition 115 are severable and properly may be given effect.

Before reaching the contested issues, we briefly outline the basic provisions of the new measure. As in *Brosnahan* and *Amador*, we caution that our summary description and interpretation of the measure by no means preclude subsequent litigation regarding the meaning or legality of its provisions, apart from the specific issues considered herein. (See *Brosnahan, supra*, 32 Cal.3d at p. 242; *Amador, supra*, 22 Cal.3d at p. 220.)

## II. SUMMARY OF PROPOSITION 115

### A. *Preamble*

As previously explained, the measure is entitled the "Crime Victims Justice Reform Act." The preamble recites that the people of the state "hereby find that the rights of crime victims are too often ignored by our courts and by our State Legislature, that the death penalty is a deterrent to murder, and that comprehensive reforms are needed in order to restore balance and fairness to our criminal justice system."

The preamble continues by stating that in order to accomplish these goals, "we the people further find that it is necessary to reform the law as developed in numerous California Supreme Court decisions and as set forth in the statutes of this state. These decisions and statutes have unnecessarily expanded the rights of accused criminals far beyond that which is required by the United States Constitution, thereby unnecessarily adding to the costs of criminal cases, and diverting the judicial process from its function as a quest for truth."

Finally, the preamble observes that the goals of the measure are "to restore balance to our criminal law system, to create a system in which justice is swift and fair, . . . in which violent criminals receive just punishment, in which crime victims and witnesses are treated with care and respect, and in which society as a whole can be free from the fear of crime in our homes, neighborhoods, and schools."

The measure adopts a variety of changes and additions to our state Constitution and statutes. We summarize the primary changes and additions below.

### B. *Postindictment Preliminary Hearings*

The measure adds section 14.1 to article I of the state Constitution, to provide that "If a felony is prosecuted by indictment, there shall be no postindictment preliminary hearing."

### C. *Independent Construction of State Constitutional Criminal Rights*

The measure amends section 24 of article I of the state Constitution, to provide that certain enumerated criminal law rights shall be construed consistently with the United States Constitution, and shall not be construed to afford greater rights to criminal or juvenile defendants than afforded by

the federal Constitution. We discuss this amendment in greater detail in connection with our analysis of the "revision" issue (pt. III.B., below).

### D. *People Entitled to Due Process and Speedy, Public Trial*

The measure adds section 29 to article I of the state Constitution, to provide that "In a criminal case, the people of the State of California have the right to due process of law and to a speedy and public trial."

### E. *Joinder and Severance of Cases*

Section 30, subdivision (a), is added to article I, declaring that the state Constitution will not be construed to bar joinder of criminal cases as may be provided by law. In addition, the measure adds section 954.1 to the Penal Code, stating that jointly charged offenses need not be cross-admissible to join them for trial. Finally, section 1050.1 is added to the Penal Code to provide that (1) a continuance granted to one or more jointly charged codefendants shall constitute good cause for a continuance as to the other codefendants, so as to maintain the joinder of cases, and (2) the court shall not sever jointly charged cases due to the unavailability or unpreparedness of one or more codefendants unless it is impossible for all codefendants to be available and prepared within a reasonable time.

### F. *Hearsay Testimony at Preliminary Hearings*

Section 30, subdivision (b), is added to article I of the state Constitution, declaring hearsay evidence admissible at preliminary hearings in criminal cases, as may be provided by law. (See also new Pen. Code, § 872, subd. (b) [probable cause finding may rest on hearsay testimony by officer possessing certain credentials and experience]; new Evid. Code, § 1203.1 [exception to Evid. Code, § 1203 requirement for cross-examination of hearsay declarant].)

### G. *Discovery Procedures*

Section 30, subdivision (c), is added to article I of the state Constitution, calling for "reciprocal" discovery in criminal cases, as may be provided by law. The measure also adds a new chapter to the Penal Code (§ 1054 et seq.), outlining the materials and information that the prosecutor and criminal defendant must jointly disclose, such as the names, addresses and statements of intended witnesses.

In addition, the measure deletes language in sections 859, 1102.5, 1102.7 and 1430 of the Penal Code superseded by the new provisions. Finally,

section 866 of the Penal Code is amended to provide that at the preliminary examination, (1) the prosecutor may demand an offer of proof as to defense testimony, (2) the magistrate shall not permit the testimony unless it meets certain criteria (e.g., it establishes an affirmative defense, negates an element of the crime, or impeaches a witness), and (3) the purpose of the hearing is to determine probable cause, not to afford the parties an opportunity for further discovery.

### H.  Voir Dire Examination

The measure adds section 223 to the Code of Civil Procedure (and repeals former Code Civ. Proc., § 223.5), to provide that in criminal cases (1) the court shall conduct voir dire examination of prospective jurors, (2) the parties may conduct further examination on a showing of good cause, (3) voir dire should occur in the presence of the other jurors "where practicable," (4) voir dire is limited to exploring possible challenges for cause, and (5) errors in discretionary rulings regarding voir dire examination do not require reversal of judgment unless a "miscarriage of justice" has occurred.

### I.  Felony-murder Statute

Penal Code section 189, the felony-murder statute, is amended to add kidnapping, train wrecking, and various sex offenses to the list of felonies supporting a charge of first degree murder.

### J.  Special Circumstance Statutes

Penal Code section 190.2 is amended in various respects, including (1) expanding the witness-murder provision (subd. (a)(10)) to include juvenile proceedings; (2) deleting the requirement in the torture-murder provision (subd. (a)(18)) of proof of the infliction of extreme physical pain; (3) dispensing with any requirement the actual killer have an intent to kill, as to any special circumstance provision not expressly requiring such intent; (4) imposing a penalty of death or life imprisonment without parole for aiders and abettors of first degree murder who intend to kill, when special circumstances exist; and (5) imposing a penalty of death or life imprisonment without parole for aiders and abettors of felony murder who "with reckless indifference to human life and as a major participant" aid and abet in the commission of any felony specified in Penal Code section 189 that results in death.

In addition, new section 190.41 is added to the Penal Code, providing that the corpus delicti of a felony-murder special circumstance "need not be proved independently of a defendant's extrajudicial statement." Further, section 190.5 is added to the Penal Code, providing for a penalty of life imprisonment without parole, or a term of 25 years to life, for defendants ages 16 or 17, who commit first degree murder, when special circumstances

exist. Finally, section 1385.1 is added to the Penal Code, providing that a judge may not strike or dismiss a special circumstance finding.

### K. *Torture Statute*

The measure adds sections 206 and 206.1 to the Penal Code, to define the crime of torture, dispense with the requirement of proof the victim suffered pain, and impose a term of life imprisonment.

### L. *Appointment of Counsel*

The measure adds section 987.05 to the Penal Code, requiring the appointment of counsel willing and able to proceed with the preliminary examination and trial of felony cases in a timely manner, in accordance with standards specified in the new provision.

### M. *Trial Date and Continuances*

Section 1049.5 is added to the Penal Code to provide for a trial of felony cases within 60 days of arraignment unless good cause is shown (and stated on the record) for lengthening the time. New section 1511 is added to the Penal Code to allow either party to seek appellate writ review of a ruling which sets the trial beyond the 60-day period without good cause, or continues the hearing of any matter without good cause. Such a petition has preference over all other cases. (See also new Pen. Code, § 871.6 [mandate review by superior court of delays in holding preliminary examinations].)

### N. *Severance Clause*

The measure contains a severance clause declaring that, "If any provision of this measure or the application thereof to any person or circumstances is held invalid, that invalidity shall not affect other provisions or applications of the measure which can be given effect without the invalid provision or application, and to this end the provisions of this measure are severable."

### O. *Amendment by Legislature*

The measure's statutory provisions "may not be amended by the Legislature except by statute passed in each house by roll call vote entered in the

journal, two-thirds of the membership concurring, or by a statute that becomes effective only when approved by the electors."

## III. Contentions

### A. *Single-subject Rule*

Under the California Constitution, "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." (Art. II, § 8, subd. (d).) This court has recently considered numerous initiative challenges based on the single-subject rule, and the principles that guide our analysis are now well settled. ■ We have held that "an initiative measure does not violate the single-subject requirement 'if, despite its varied collateral effects, *all of its parts are "reasonably germane"* to each other,' and to the general purpose or object of the initiative. [Citations.]" (*Brosnahan, supra*, 32 Cal.3d at p. 245, quoting *Amador, supra*, 22 Cal.3d at p. 230, italics added by *Brosnahan*; see also *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 841-842 [258 Cal.Rptr. 161, 771 P.2d 1247]; *Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078, 1098-1099 [240 Cal.Rptr. 569, 742 P.2d 1290]; *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 38-41 [157 Cal.Rptr. 855, 599 P.2d 46] [hereafter *FPPC*].)

The case closest on point is *Brosnahan* itself, which dealt with a multifarious criminal justice reform initiative (Proposition 8) quite similar in purpose, scope and effect to the measure under scrutiny here. We summarized the essential components of Proposition 8 at 32 Cal.3d, pages 242-245 of our *Brosnahan* opinion. The measure contained a preamble, comparable to the one introducing Proposition 115, expressing "grave statewide concern" for crime victims and announcing "broad reforms" in the procedures governing the trial and sentencing of criminals.

There followed a variety of constitutional and statutory provisions and amendments, including a right to *restitution* by crime victims, an "inalienable right" to *safe schools*, a "truth-in-evidence" provision which essentially abrogated most of the state's *evidentiary exclusionary rules*, restrictions on *bail*, unlimited use of *prior convictions* for impeachment or enhancement purposes, abolition of the *diminished capacity defense*, sentence enhancements for *habitual criminals*, consideration at sentencing of *statements of crime victims* or their families, limitations on *plea bargaining*, restrictions on commitment to the *California Youth Authority*, and repeal of provisions governing *mentally disordered sex offenders*.

In *Brosnahan*, we held that, despite its varied topics, "it is readily apparent that Proposition 8 meets the 'reasonably germane' standard." (32 Cal.3d

at p. 247.) We described the theme unifying these various provisions as follows: "Each of [the measure's] several facets bears a common concern, 'general object' or 'general subject,' *promoting the rights of actual or potential crime victims.* As explained in the initiative's preamble, the 10 sections were designed to strengthen *procedural and substantive safeguards for victims in our criminal justice system.* These changes were aimed at achieving more severe punishment for, and more effective deterrence of, criminal acts, protecting the public from the premature release into society of criminal offenders, providing safety from crime to a particularly vulnerable group of victims, namely school pupils and staff, and assuring restitution for the victims of criminal acts. [¶] . . . Proposition 8 constitutes a reform aimed at certain features of the criminal justice system *to protect and enhance the rights of crime victims.* This goal is the readily discernible common thread which unites all of the initiative's provisions in advancing its common purpose." (*Ibid.,* italics added.)

■ *Brosnahan* is controlling here. As with Proposition 8, the various elements of Proposition 115 unite to form a comprehensive criminal justice reform package. As in *Brosnahan*, the measure was "designed to strengthen procedural and substantive safeguards for victims in our criminal justice system." (32 Cal.3d at p. 247.) Procedurally, restrictions are imposed on the rights of criminal defendants during the *discovery* stage (allowing reciprocal discovery, and codifying discovery rules), the *preliminary examination* stage (excluding postindictment preliminary hearings, and allowing use of hearsay testimony), and the *trial* stage (promoting joinder and limiting severance, restricting voir dire by counsel, regulating appointment of counsel, and limiting trial continuances). Substantively, the measure creates the new offense of *torture*, and revises both the *felony-murder* and *special circumstance* statutes, to achieve more severe punishment for criminal defendants whose offenses or conduct fall within those provisions. As in *Brosnahan*, the single subject of Proposition 115 is promotion of the rights of actual and potential crime victims.

A subsidiary unifying theme underlying Proposition 115 is that all the foregoing changes appear directed toward abrogating particular holdings of this court that the initiative's framers deemed unduly expansive of criminal defendants' rights. Once again, *Brosnahan* applies here. In that case, we stressed that "We are reinforced in our conclusion that Proposition 8 embraces a single subject by observing that the measure appears to reflect public dissatisfaction with several prior judicial decisions in the area of criminal law . . . . In our democratic society in the absence of some compelling, overriding constitutional imperative, we should not prohibit the sovereign people from either expressing or implementing their own will on

matters of such direct and immediate importance to them as their own perceived safety." (32 Cal.3d at p. 248.)

As previously observed, the preamble to Proposition 115 recites that "we the people further find that it is necessary to reform the law as developed in numerous California Supreme Court decisions . . . [that] have unnecessarily expanded the rights of accused criminals." The measure proceeds to adopt various changes in procedural or substantive law previously mandated by this court. For example, the restriction on postindictment preliminary hearings seems directed toward our holding in *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586 P.2d 916]; the changes in the special circumstance statutes seem aimed at such decisions as *People* v. *Spears* (1983) 33 Cal.3d 279 [188 Cal.Rptr. 454, 655 P.2d 1289] (sentence of life imprisonment without parole unavailable for persons under age 18), *People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029] (trial court's power to strike or dismiss special circumstance finding), *People* v. *Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887] (independent proof of corpus delicti required for felony-murder special circumstance), and *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (intent to kill requirement). Similar citations could be provided for the other procedural and substantive changes accomplished by Proposition 115.

Thus, although the provisions of Proposition 115 seem somewhat disparate, as in *Brosnahan* they reflect a consistent theme or purpose to nullify particular decisions of our court affecting various aspects of the criminal justice system. We do not suggest, of course, that a measure addressing wholly diverse and unrelated subjects could be saved from a single-subject challenge by the mere fact of perceived public displeasure with court decisions or statutes treating those matters.

■ Petitioners argue that the broad diversity of the provisions of Proposition 115 suggests the possibility that "logrolling" played a part in its passage. They contend that "The law [Proposition 115] also links together matters which, by themselves, could not command a majority yet do so either by combining minority constituencies or by adding on many provisions as, in effect, loosely affiliated 'riders' to other provisions which command strong public support. (See *Harbor* v. *Deukmejian* [*supra*] 43 Cal.3d at 1096.)"

We considered and rejected a similar argument in *Brosnahan*, noting that such risks are inherent in the passage of most laws, whether enacted by the Legislature or by initiative, in which benefits and burdens must be evaluated. As we stated, "The decision to enact laws, whether directly by the

people or through their representatives, involves the weighing of pros and cons. The resolution of few public issues is free from this balancing process and exercise of choices." (32 Cal.3d at p. 251.) We thus rejected the argument that the single-subject rule contemplates some functional interrelationship or interdependence, or "requires a showing that each one of a measure's several provisions was capable of gaining voter approval independently of the other provisions." (*Ibid*.; see also *FPPC, supra*, 25 Cal.3d at p. 42; *Amador, supra*, 22 Cal.3d at p. 232.)

Finally, petitioners suggest the diversity of its provisions rendered Proposition 115 "unconscionably complex, defying ready summary or easy comprehension by even the most 'conscientious and sophisticated' voters." We disagree. As with Proposition 8 in *Brosnahan*, Proposition 115 was the subject of intense public focus (centering on its potential effect on abortion rights) prior to the election. The official voters' pamphlet set forth a summary of the measure, a detailed analysis by the Legislative Analyst, and a complete text of the proposed measure, together with the customary written arguments and rebuttals. We must assume the voters duly considered and comprehended these materials. (See *Brosnahan, supra*, 32 Cal.3d at pp. 251-252; *Amador, supra*, 22 Cal.3d at pp. 231, 243-244.)

Supplementing their single-subject attack, petitioners predict dire consequences will befall the state if Proposition 115 is permitted to remain in effect. They posit great delays and soaring financial costs in prosecuting, defending and trying cases. Similar arguments were made in *Brosnahan*, in which the petitioners forecast "judicial and educational chaos" as a result of the implementation of Proposition 8. (32 Cal.3d at p. 261; see also *Amador, supra*, 22 Cal.3d at pp. 224-226.) As we indicated in both those cases, nothing on the face of the challenged measures "necessarily or inevitably" compels such dire results. A similar conclusion applies here.

We conclude that Proposition 115 does not violate the single-subject requirement of the California Constitution.

### B. *Constitutional Revision or Amendment*

Petitioners next argue that Proposition 115 in effect achieved a constitutional *revision* rather than a mere amendment. Although "[t]he electors may amend the Constitution by initiative" (Cal. Const., art. XVIII, § 3), a "revision" of the Constitution may be accomplished only by convening a constitutional convention and obtaining popular ratification (*id*., § 2), or by legislative submission of the measure to the voters (*id*., § 1). (See also *Amador, supra*, 22 Cal.3d at p. 221.) Petitioners suggest the revision provision is based on the principle that "comprehensive changes" to the Consti-

tution require more formality, discussion and deliberation than is available through the initiative process. (See Note, *Preelection Judicial Review: Taking the Initiative in Voter Protection* (1983) 71 Cal.L.Rev. 1216, 1224.)

Although the Constitution does not define the terms "amendment" or "revision," the courts have developed some guidelines helpful in resolving the present issue. As explained in *Amador*, and confirmed in *Brosnahan*, our revision/amendment analysis has a dual aspect, requiring us to examine both the quantitative and qualitative effects of the measure on our constitutional scheme. Substantial changes in either respect could amount to a revision. (See *Brosnahan, supra*, 32 Cal.3d at p. 260; *Amador, supra*, 22 Cal.3d at p. 223.) Before examining the applicable authorities in greater depth, we first set forth the nature of petitioners' revision challenge.

Petitioners' arguments focus primarily on a single provision of Proposition 115, namely, the amendment to article I, section 24, of the state Constitution relating to the independent nature of certain rights guaranteed by that Constitution. (The additional constitutional changes effected by Proposition 115, involving such isolated matters as postindictment preliminary hearings, joinder of cases, use of hearsay, reciprocal discovery, and the People's right to due process and a speedy, public trial, cannot be deemed matters which standing alone, or in the aggregate, substantially change our preexisting governmental framework.) As will appear, petitioners' arguments are well taken.

Article I, section 24, added in 1974, originally provided in relevant part that "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." Proposition 115 would add the important proviso that "In criminal cases the rights of a defendant to equal protection of the laws, to due process of law, to the assistance of counsel, to be personally present with counsel, to a speedy and public trial, to compel the attendance of witnesses, to confront the witnesses against him or her, to be free from unreasonable searches and seizures, to privacy, to not be compelled to be a witness against himself or herself, to not be placed twice in jeopardy for the same offense, and not to suffer the imposition of cruel or unusual punishment, shall be construed by the courts of this state in a manner consistent with the Constitution of the United States. This Constitution shall not be construed by the courts to afford greater rights to criminal defendants than those afforded by the Constitution of the United States, nor shall it be construed to afford greater rights to minors in juvenile proceedings on criminal causes than those afforded by the Constitution of the United States."

Petitioners stress the formidable impact of the measure on the constitutional rights of criminal defendants, asserting that at least 32 such rights are

affected and essentially "eliminated" by Proposition 115 and its amendment to section 24 to article I of the Constitution (hereafter article I, section 24). In petitioners' view, the measure has in essence "vested" or "delegated" all judicial interpretive power respecting those rights in or to the *federal* courts.

Respondent Attorney General, on the other hand, consistent with an interpretation previously given by him (see Cal. Dept. Justice, 1990 Crime Victims Justice Reform Initiative, Proposition 115 Manual, at pp. 13-15), takes the position that the last sentence of the new section must be read as referring only to the enumerated rights mentioned in the immediately preceding sentence, and not also to unspecified rights, such as the right to jury trial, free speech, habeas corpus or bail. Otherwise, the last sentence would render wholly superfluous the preceding sentence specifying the various rights affected, a result we must avoid in construing the measure. (E.g., *Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 676 [194 Cal.Rptr. 781, 669 P.2d 17] [constitutional provisions added by initiative "must be harmonized and construed to give effect to all parts"].)

We need not resolve the foregoing interpretive debate, for even if we adopt respondent's position, in our view the effect of the measure would be so far reaching as to amount to a constitutional revision beyond the scope of the initiative process. We turn to a discussion of the quantitative and qualitative effects of Proposition 115 and particularly its restriction on the independent judicial interpretation of the enumerated state constitutional rights.

1. *Quantitative effect*—Quantitatively, Proposition 115 does not seem "so extensive . . . as to change directly the 'substantial entirety' of the Constitution by the deletion or alteration of numerous existing provisions . . . ." (*Amador, supra*, 22 Cal.3d at p. 223.) The measure deletes no existing constitutional language and it affects only *one* constitutional article, namely, article I. As previously outlined, the measure adds three new sections to this article and amends a fourth section. In short, the quantitative effects on the Constitution seem no more extensive than those presented in prior cases upholding initiative measures challenged as constitutional revisions. (See *Brosnahan, supra*, 32 Cal.3d at p. 260 [upholding measure likewise affecting only Cal. Const., art. I]; *Amador, supra*, at p. 224 [upholding measure affecting only a few articles dealing with taxation]; cf. *McFadden* v. *Jordan* (1948) 32 Cal.2d 330, 334-345 [196 P.2d 787] [invalidating measure adding 21,000 words to Constitution and affecting 15 of its 25 articles].)

2. *Qualitative effect*—We have stated that, apart from a measure effecting widespread deletions, additions and amendments involving many constitutional articles, "even a relatively simple enactment may accomplish

such far reaching changes in the nature of our basic governmental plan as to amount to a revision also . . . . [A]n enactment which purported to vest all judicial power in the Legislature would amount to a revision without regard either to the length or complexity of the measure or the number of existing articles or sections affected by such change." (Amador, supra, 22 Cal.3d at p. 223, italics added; see also McFadden v. Jordan, supra, 32 Cal.2d at pp. 347-348 [rejecting argument that revision must involve changes affecting all articles of Constitution].)

Proposition 115 contemplates a similar qualitative change. In essence and practical effect, new article I, section 24, would vest all judicial interpretive power, as to fundamental criminal defense rights, in the United States Supreme Court. From a qualitative standpoint, the effect of Proposition 115 is devastating.

Even under respondent Attorney General's "limited" construction of new article I, section 24, fundamental constitutional rights are implicated, including the rights to due process of law, equal protection of the law, assistance of counsel, and avoidance of cruel and unusual punishment. As to these rights, as well as the other important rights listed in new section 24, California courts in criminal cases would no longer have authority to inter- pret the state Constitution in a manner more protective of defendants' rights than extended by the federal Constitution, as construed by the United States Supreme Court. (Decisions of the lower federal courts interpreting federal law, though persuasive, are not binding on state courts. See People v. Bradley (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 780, p. 751, and cases cited.)

For example, if the high court were to rule that public torture or maiming of persons convicted of minor misdemeanors did not offend the federal due process, equal protection or cruel and unusual punishment clauses, presum- ably the California courts interpreting similar state constitutional guaran- ties would be compelled to agree and to uphold state legislation imposing such severe forms of punishment. As a practical matter, ultimate protection of criminal defendants from deprivation of their constitutional rights would be left in the care of the United States Supreme Court. Moreover, the nature and extent of state constitutional guaranties would remain uncertain and undeveloped unless and until the high court had spoken and clarified feder- al constitutional law.

In effect, new article I, section 24, would substantially alter the substance and integrity of the state Constitution as a document of independent force and effect. As an historical matter, article I and its Declaration of Rights was viewed as the only available protection for our citizens charged with

crimes, because the federal Constitution and its Bill of Rights was initially deemed to apply only to the conduct of the federal government. In framing the Declaration of Rights in both the 1849 and 1879 California Constitutions, the drafters largely looked to the constitutions of the other states, rather than the federal Constitution, as potential models. (See e.g., *Mitchell* v. *Superior Court* (1989) 49 Cal.3d 1230, 1241-1245 [265 Cal.Rptr. 144, 783 P.2d 731]; *Barron* v. *Baltimore* (1833) 32 U.S. 243, 247-251 [8 L.Ed. 672, 674-675]; Grodin, *Some Reflections on State Constitutions* (1988) 15 Hastings Const.L.Q. 391, 393-397.)

Thus, Proposition 115 not only unduly restricts judicial power, but it does so in a way which severely limits the independent force and effect of the California Constitution. We acknowledge that, as respondent Attorney General observes, the idea of deferring to the United States Supreme Court in interpreting identical or similar constitutional language found in the state and federal Constitutions is not new. As early as 1938, we stated that "cogent reasons must exist before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution." (*Gabrielli* v. *Knickerbocker* (1938) 12 Cal.2d 85, 89 [82 P.2d 391]; see also *People* v. *Teresinski* (1982) 30 Cal.3d 822, 835-839 [180 Cal.Rptr. 617, 640 P.2d 753]; *People* v. *Chavez* (1980) 26 Cal.3d 334, 349-361 [161 Cal.Rptr. 762, 605 P.2d 401]; cf. *People* v. *Houston* (1986) 42 Cal.3d 595, 624 [230 Cal.Rptr. 141, 724 P.2d 1166] [dis. opn. by Lucas, J., discerning no "independent state interest needing additional protection" than afforded by federal law]; *People* v. *Disbrow* (1976) 16 Cal.3d 101, 119 [127 Cal.Rptr. 360, 545 P.2d 272] [dis. opn. by Richardson, J., calling for deference to the high court's constitutional interpretations "in the absence of very strong countervailing circumstances"]; *People* v. *Norman* (1975) 14 Cal.3d 929, 941 [123 Cal.Rptr. 109, 538 P.2d 237] [dis. opn. by Clark, J.].)

The foregoing authorities acknowledge and support a *general* principle or policy of deference to United States Supreme Court decisions, a policy applicable in the absence of good cause for departure or deviation therefrom. Yet it is one thing voluntarily to defer to high court decisions, but quite another to *mandate* the state courts' blind obedience thereto, despite "cogent reasons," "independent state interests," or "strong countervailing circumstances" that might lead our courts to construe similar state constitutional language differently from the federal approach.

Despite the general rule of deference, the adoption in 1974 of article I, section 24, confirmed that the California courts had the authority to adopt an independent interpretation of the state Constitution. As the section then read, in pertinent part, "Rights guaranteed by this Constitution are not

354

dependent on those guaranteed by the United States Constitution." This declaration of independence made explicit a preexisting fundamental principle of constitutional jurisprudence (see Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 5, 1974), analysis by Legislative Analyst, p. 26), and in the years that followed served as the basis for numerous decisions interpreting the state Constitution as extending protection to our citizens beyond the limits imposed by the high court under the federal Constitution. (See, e.g., *People v. Houston, supra,* 42 Cal.3d 595, 609-610 [self-incrimination privilege]; *People v. Ramos* (1984) 37 Cal.3d 136, 152 [207 Cal.Rptr. 800, 689 P.2d 430] [due process clause]; *People v. Bustamante* (1981) 30 Cal.3d 88, 97-99 [177 Cal.Rptr. 576, 634 P.2d 927] [right to counsel]; *People v. Pettingill* (1978) 21 Cal.3d 231, 247-248 [145 Cal.Rptr. 861, 578 P.2d 108] [self-incrimination privilege]; *People v. Hannon* (1977) 19 Cal.3d 588, 606-608 [138 Cal.Rptr. 885, 564 P.2d 1203] [right to speedy trial]; *People v. Disbrow, supra,* 16 Cal.3d 101, 114-115 [self-incrimination privilege]; *People v. Norman, supra,* 14 Cal.3d 929, 939 [unreasonable search and seizure]; *People v. Brisendine* (1975) 13 Cal.3d 528, 548-552 [119 Cal.Rptr. 315, 531 P.2d 1099] [same].)

While acknowledging the policy of deference, most of the foregoing cases reaffirmed the overriding principle that this court sits "as a court of last resort [in interpreting state constitutional guaranties], subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter." (*People v. Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753].) In each of these cases, dissenting justices argued against adopting an independent interpretation of the applicable state constitutional provisions. But no dissenter ever suggested that deference was compelled as a matter of constitutional imperative.

Proposition 115 imposes such an imperative for the first time in California's history. It substantially alters the preexisting constitutional scheme or framework heretofore extensively and repeatedly used by courts in interpreting and enforcing state constitutional protections. It directly contradicts the well-established jurisprudential principle that, "The judiciary, from the very nature of its powers and means given it by the Constitution, must possess the right to construe the Constitution in the last resort . . . ." (*Nogues v. Douglass* (1858) 7 Cal. 65, 69-70; see also *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137, 176 [2 L.Ed. 60, 73] [interpreting and applying the Constitution is "the very essence of judicial power"]; *Marin Water, etc. Co. v. Railroad Com.* (1916) 171 Cal. 706, 711-712 [154 P. 864].) In short, in the words of *Amador, supra,* this "relatively simple enactment [accomplishes] . . . such far reaching changes in the nature of our basic

governmental plan as to amount to a revision . . . ." (22 Cal.3d at p. 223; see also *Livermore* v. *Waite* (1894) 102 Cal. 113, 118-119 [36 P. 424] [revisions involve changes in the "underlying principles" on which the Constitution rests].)

It is true, as the Attorney General observes, that in two earlier cases we rejected revision challenges to initiative measures which included somewhat similar restrictions on judicial power. In *In re Lance W.* (1985) 37 Cal.3d 873, 891 [210 Cal.Rptr. 631, 694 P.2d 744], we upheld a provision limiting the state exclusionary remedy for search and seizure violations to the boundaries fixed by the Fourth Amendment to the federal Constitution. In *People* v. *Frierson* (1979) 25 Cal.3d 142, 184-187 [158 Cal.Rptr. 281, 599 P.2d 587], we upheld a provision which in essence required California courts in capital cases to apply the state cruel or unusual punishment clause consistently with the federal Constitution.

Both *Lance W.* and *Frierson* concluded that no constitutional revision was involved because the isolated provisions at issue therein achieved no far reaching, fundamental changes in our governmental plan. But neither case involved a broad attack on state court authority to exercise independent judgment in construing a wide spectrum of important rights under the state Constitution. New article I, section 24, more closely resembles *Amador's* hypothetical provision vesting all judicial power in the Legislature, a provision we deemed would achieve a constitutional revision. As noted, in practical effect, the new provision vests a critical portion of state judicial power in the United States Supreme Court, certainly a fundamental change in our preexisting governmental plan.

For all the foregoing reasons, we conclude that new article I, section 24, represents an invalid revision of the California Constitution. But its invalidity does not affect the remaining provisions of Proposition 115, which are clearly severable from the invalid portion. As previously indicated, Proposition 115 contains a severance clause providing, "If any provision of this measure or the application thereof to any person or circumstances is held invalid, that invalidity shall not affect other provisions or applications of the measure which can be given effect without the invalid provision or application, and to this end the provisions of this measure are severable."

The remaining provisions of Proposition 115 clearly can be "given effect" without regard to the validity or operation of the provision purporting to revise the "independent rights" principle of article I, section 24. As we recently explained, "[t]he cases prescribe three criteria for severability: the invalid provision must be grammatically, functionally, and volitionally separable. [Citations]." (*Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at

pp. 821-822 [involving validity of Proposition 103, an insurance rate initiative].) We briefly demonstrate that the present measure satisfies each of the foregoing criteria.

First, the invalid provision is mechanically and grammatically severable, constituting a separate and distinct provision of Proposition 115 which can be removed without affecting the wording of any other provision. Second, the invalid provision is functionally severable, touching on an area (judicial construction of state constitutional provisions) essentially unrelated to any of the various remaining substantive or procedural provisions. Finally, the invalid portion is volitionally severable, in that the remainder of the measure probably would have been adopted by the people even if they had foreseen the success of petitioners' revision challenge.

The petition for a peremptory writ of mandate is granted to the extent that it seeks to compel respondents to refrain from enforcing section 3 of Proposition 115. In all other respects the petition is denied. The parties shall bear their own costs.

Broussard, J., Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I join in the unanimous opinion of the court on the revision issue. The Chief Justice has explicated the basis for holding that section 3 of the measure known as Proposition 115 would have effected a revision of the California Constitution contrary to the requirements of our fundamental law.

I part company with my colleagues on the single-subject issue. I do not agree that this case is controlled by *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236 [186 Cal.Rptr. 30, 651 P.2d 274]. If it were, we should forthrightly overrule that discredited four-to-three decision and restore the constitutional single-subject rule to its appropriate role.

Parenthetically, one cannot fail to observe widespread disenchantment with the modern initiative process. At the November 6, 1990, General Election, 10 of the 13 initiatives on the ballot were defeated by the voters, some perhaps on the merits, but some undoubtedly because of prolix texts that were perplexing to all but the measures' authors.

*Brosnahan* v. *Brown, supra,* 32 Cal.3d 236, dealt with only one initiative on the June 8, 1982, Primary Election ballot, and magnanimously held the measure did not violate the single-subject rule. The opinion, however, did not give carte blanche to initiative promoters to join together numerous

disparate topics into one "grabbag" proposal, held together with a seductive title designed for voter appeal. Indeed, the four justices in the majority warned that they were not suggesting "that initiative proponents are given blank checks to draft measures containing unduly diverse or extensive provisions bearing no reasonable relationship to each other . . . ." (*Id.* at p. 253.) In short, they were considering one proposition only and not devising a rule requiring approval of subsequent measures.

A cursory reading of Proposition 115 reveals the monumental complexity and diversity of the 31 sections that it contains. The measure reaches into multitudinous areas. It also makes many changes. For example, in the Constitution, three new sections are added and one amended; in the Code of Civil Procedure, one new section is added and two repealed; in the Evidence Code, one new section is added; and in the Penal Code, eighteen new sections are added, six sections are amended, and three sections are repealed. It is difficult to conceive of a more pervasive violation of the single-subject rule.

Since 1911 the California Constitution has declared that the legislative power is vested in the Legislature but the people reserve to themselves the power of initiative. The original wording was as follows: "The legislative power of this State shall be vested in a senate and assembly which shall be designated 'The legislature of the State of California,' but the people reserve to themselves the power to propose laws and amendments to the Constitution, and to adopt or reject the same at the polls, independent of the Legislature . . . ." (Cal. Const., former art. IV, § 1, added by initiative, Special Statewide Elec. (Oct. 10, 1911), reprinted in Stats. 1911, Ex. Sess. 1911, p. xvi.) The present wording is simply: "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the power[] of initiative . . . ." (Cal. Const., art. IV, § 1.)

It has long been recognized that "the initiative is in essence a legislative battering ram which may be used to tear through the exasperating tangle of the traditional legislative procedure and strike directly toward the desired end." (Key & Crouch, The Initiative and the Referendum in California (1939) p. 458 (hereafter Key and Crouch).) Although lawmaking by the Legislature and lawmaking by the people are different in process, they are, of course, identical in substance and effect.

On March 2, 1948, a bill entitled "Assembly Constitutional Amendment No. 2" was introduced in that body to add the single-subject rule as section 1c of article IV of the California Constitution. (Assem. J. (1948 Reg. Sess.) p. 68.) On March 26 the Assembly concurred in certain Senate amendments

to the bill and ordered the measure enrolled. (*Id*. at pp. 659-660.) On March 27 Assembly Constitutional Amendment No. 2 was filed with the Secretary of State. (Assem. J., *supra*, at p. 709.) It read: "Every constitutional amendment or statute proposed by the initiative shall relate to but one subject. No such amendment or statute shall hereafter be submitted to the electors if it embraces more than one subject, nor shall any such amendment or statute embracing more than one subject, hereafter submitted to or approved by the electors, become effective for any purpose." (*Id*. at p. 660.)

Preceding Assembly Constitutional Amendment No. 2 was "a series of initiatives in the 1930s and 40s, mostly far-reaching pension plans proposed by the so-called 'ham and eggs' movement led by Lawrence and Willis Allen. The initiative that apparently was the immediate stimulus for, the [measure] was a 'ham and eggs' proposal—the self-styled 'California Bill of Rights'—some of whose many provisions related to pensions, taxes, right to vote for Indians, gambling, oleomargarine, the health professions, reapportionment of the State Senate, fish and game, and surface mining. Petitions for the 'bill of rights' measure were circulating when [Assembly Constitutional Amendment No. 2] was introduced into and approved by the legislature. Campaign arguments supporting [the latter] when it was on the ballot generally used the 'bill of rights' measure as an example of the need for . . . a [single-subject] rule." (Lowenstein, *California Initiatives and the Single-Subject Rule* (1983) 30 UCLA L.Rev. 936, 949-951, fns. omitted (hereafter Lowenstein).)

Evidently in late April or early May 1948, the "California Bill of Rights" initiative measure was certified as qualified for the ballot at the November 2, 1948, General Election. (Lowenstein, *supra*, 30 UCLA L.Rev. at p. 950, fn. 57.) Before the election, in *McFadden* v. *Jordan* (1948) 32 Cal.2d 330 [196 P.2d 787], the court ordered issuance of a writ of mandate directing the Secretary of State not to submit the measure to the voters, having determined that it "amounts substantially to an [improper] attempted revision, rather than [a proper] amendment, of our state Constitution" (*id*. at p. 331).

Assembly Constitutional Amendment No. 2 was placed on the ballot at the November 2, 1948, General Election as Proposition 10. The ballot pamphlet contained arguments for and against the measure.

The argument in favor stated that "The purposes to be achieved are: [¶] (1) Simplification and clarification of issues presented to the voters, and [¶] (2) A more intelligent amendment of the constitution by permitting the *adopted sections to be placed in appropriate subdivisions of the constitution*." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with

arguments to voters, Gen. Elec. (Nov. 2, 1948), pt. I, argument in favor of Prop. 10, p. 8.)

The argument in opposition was in pertinent part as follows: "The Constitution was amended in 1911 to reserve to the people the right to initiate laws and constitutional amendments—the right, as individual electors, to a direct voice in the government of this State. [¶] Proponents of this proposition now seek to restrict this power reserved to the people by requiring that each initiative measure relate to only one subject. [¶] There is no basis upon which this infringement on the right of the people can be justified . . . . [¶] . . . [¶] Should this proposition carry it will create a lawyer's holiday as initiative measures hereafter will be attacked to prove that more than one subject was involved. After all, what constitutes one subject? Is 'taxation,' or 'education,' or 'liquor,' or 'social welfare' one or more than one subject? Only the Supreme Court will be able to determine after long and expensive litigation." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 2, 1948), pt. I, argument against Prop. 10, p. 9.)

On November 2, 1948, Assembly Constitutional Amendment No. 2 was approved by the voters and as a result section 1c was added to article IV of the California Constitution. In 1966 section 1c of article IV was repealed and section 22, subdivision (d), was added in its place: "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." Thus came the single-subject rule into its present wording. In 1976 section 22 of article IV was renumbered as section 8 of article II. Thus came the single-subject rule into its present numbering: article II, section 8, subdivision (d).

In the years since its adoption, the single-subject rule has been construed and applied in several opinions by this court and its members and also by the Courts of Appeal: *Perry* v. *Jordan* (1949) 34 Cal.2d 87 [207 P.2d 47] (hereafter sometimes *Perry*), which followed *Evans* v. *Superior Court* (1932) 215 Cal. 58 [8 P.2d 467], a case dealing with the single-subject rule for statutes; *Metropolitan Water Dist.* v. *Marquardt* (1963) 59 Cal.2d 159 [28 Cal.Rptr. 724, 379 P.2d 28] (dealing directly with the single-subject rule for statutes); *Schmitz* v. *Younger* (1978) 21 Cal.3d 90 [145 Cal.Rptr. 517, 577 P.2d 652]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281]; *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33 [157 Cal.Rptr. 855, 599 P.2d 46]; *Brosnahan* v. *Eu* (1982) 31 Cal.3d 1 [181 Cal.Rptr. 100, 641 P.2d 200]; *Brosnahan* v. *Brown, supra*, 32 Cal.3d 236; *Planned Parenthood Affiliates* v. *Swoap* (1985) 173 Cal.App.3d 1187 [219 Cal.Rptr. 664] (dealing directly with the single-subject rule for statutes);

*Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078 [240 Cal.Rptr. 569, 742 P.2d 1290] (same); *California Trial Lawyers Assn.* v. *Eu* (1988) 200 Cal.App.3d 351 [245 Cal.Rptr. 916]; and *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247].

After review of its history and its construction and application in specific cases, it becomes clear that the single-subject rule requires an initiative measure to constitute a coherent enactment in and of itself—negatively, in the words of article II, section 8, subdivision (d), of the California Constitution, not to "embrac[e] more than one subject." It is not enough for such a measure merely to be capable of bearing some label of indefinite scope. The reason is plain: "*any* combination of concepts and things may appropriately be regarded as a 'subject' so long as there are people who find it expedient to so classify them" (Lowenstein, *supra*, 30 UCLA L.Rev. at p. 939, italics in original). Of course, such people *always* exist for *every* initiative, at least among its proponents. Therefore, if the rule required a label and nothing more, it would be nugatory.

It follows that the "reasonably germane" test—which the cases have framed and used to implement the single-subject rule—must contain as its ultimate criterion whether the initiative measure in question is internally interrelated as a whole and parts. To be sure, the test does "not require the several provisions of an initiative to be related to each other in any particular manner." (Lowenstein, *supra*, 30 UCLA L.Rev. at p. 944.) But it does indeed require them to be related to each other in some reasonable fashion. (See *ibid*.) A standard that focuses on whether the measure is capable of bearing some label of indefinite scope is simply empty. This point has been recognized by the courts when they warn that "the rule obviously forbids joining disparate provisions which appear germane only to topics of excessive generality such as 'government' or 'public welfare.' " (*Brosnahan* v. *Brown, supra*, 32 Cal.3d at p. 253; see *California Trial Lawyers Assn.* v. *Eu, supra*, 200 Cal.App.3d at p. 358; cf. *Harbor* v. *Deukmejian, supra*, 43 Cal.3d at pp. 1099, 1100-1101 [single-subject rule for statutes].)

The conclusion that the single-subject rule establishes, as it were, a requirement of *substance* rather than *label* derives from the language of the rule, the intent underlying its words, the construction adopted and applied by the courts, and the actual results yielded in individual cases. These matters will be reviewed seriatim.

First, the language of the single-subject rule reveals that the requirement established is one of substance rather than label. As noted, article II, section 8, subdivision (d), of the California Constitution declares that "An initiative measure embracing more than one subject may not be submitted to the

electors or have any effect." The rule impliedly requires initiatives to "emb-rac[e]"—in other words, *comprise* —only "one subject." It does not speak only of a capability to bear some label of indefinite scope. This causes no surprise. As explained above, to require such a capability is to require virtually nothing.

Second, the intent of the single-subject rule points to a requirement of substance rather than label. As the history presented above demonstrates, the basic object of the rule is manifest: to prevent the submission or approv-al of incoherent initiative measures that are little more than "grabbags" of various provisions. Certainly, the object is *not* to require that a measure simply be capable of bearing some label of indefinite scope. The opponents of Proposition 10, which added the single-subject rule to the California Constitution, argued in the ballot pamphlet: "Should this proposition carry it will create a lawyer's holiday as initiative measures hereafter will be attacked to prove that more than one subject was involved. After all, what constitutes one subject? Is 'taxation,' or 'education,' or 'liquor,' or 'social welfare' one or more than one subject? Only the Supreme Court will be able to determine after long and expensive litigation." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 2, 1948), pt. I, argument against Prop. 10, p. 9.) It should of course be presumed that the voters intended the rule *not* to be read in accordance with such a self-nullifying interpretation.

Whether or not, as has commonly been asserted, the single-subject rule is intended to prevent "logrolling" or voter confusion or both (see, e.g., *Bros-nahan* v. *Eu, supra*, 31 Cal.3d at p. 7 (conc. & dis. opn. of Mosk, J.) [voter confusion]; *Amador Valley Joint Union High School Dist.* v. *State Bd. of Equalization, supra*, 22 Cal.3d at p. 231 [voter confusion]; *Schmitz* v. *Youn-ger, supra*, 21 Cal.3d at pp. 97-98 (dis. opn. of Manuel, J.) ["logrolling" and voter confusion]; but see Lowenstein, *supra*, 30 UCLA L.Rev. at pp. 954-963), the rule is perhaps best "understood as simply reflecting a sense of what initiatives are supposed to be. The 'ham and eggs' proposals caused concern . . . mostly because they were simply too diverse and far-reaching. Such proposals . . . were . . . beyond the intended scope of the initiative as an instrument of governance. [¶] . . . The initiative was neither intended nor suited for wholesale law revisions. [¶] . . . The initiative's purpose was to provide an outlet for the public's dissatisfaction with the legislature's treatment or nontreatment of an important and, in many cases, broad policy area . . . . The initiative process is not well-suited to simultaneous policy changes across the board. When such changes are desired, the remedy is to elect new legislators." (Lowenstein, *supra*, 30 UCLA L.Rev. at pp. 963-964.) Put simply, the single-subject rule was intended to further coherent enactments.

Third, the construction of the single-subject rule adopted and applied by the courts reveals that the requirement established is one of substance rather than label. Thus, in the seminal decision of *Perry* v. *Jordan, supra,* 34 Cal.2d 87, which was virtually contemporaneous with the adoption of the rule, the court declared: " 'Numerous provisions, having one general object, . . . may be united in one act. Provisions governing projects so related and interdependent as to constitute a single scheme may be properly included within a single act . . . .' " (*Id.* at p. 92, quoting *Evans* v. *Superior Court, supra,* 215 Cal. at p. 62 , ellipsis added.) *Perry* has been expressly or impliedly followed, without deviation, in the years that followed. (See *Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at pp. 841-842; *Brosnahan* v. *Brown, supra,* 32 Cal.3d at pp. 245-247; *Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d at pp. 38-39 (plur. opn.); *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 229-230; *California Trial Lawyers Assn.* v. *Eu, supra,* 200 Cal.App.3d at pp. 357-358; cf. *Harbor* v. *Deukmejian, supra,* 43 Cal.3d at p. 1098 [single-subject rule for statutes]; *Planned Parenthood Affiliates* v. *Swoap, supra,* 173 Cal.App.3d at pp. 1195-1197 [same].)

It must, of course, be admitted that some cases do indeed contain loose language suggesting that the single-subject rule would be satisfied if the initiative measure in question was simply capable of bearing some label of indefinite scope. Such language, however, constitutes mere dictum: with the possible exception of *Brosnahan* v. *Brown, supra,* 32 Cal.3d 236—more on which later—it is not necessary to any decision. Also, as explained above, it is radically unsound, threatening to make the constitutional requirement nugatory.

Fourth and finally, the actual results yielded in individual cases in which the single-subject rule operates show that the requirement established is one of substance rather than label.

Thus, a single-subject challenge was unanimously denied in *Perry* v. *Jordan, supra,* 34 Cal.2d 87, which reviewed an initiative measure to repeal an article of the California Constitution providing for pensions for the needy aged and blind. A similar claim was unanimously rejected in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, which considered the measure adding article XIII A, the parts of which were "reasonably interrelated and interdependent, forming an interlocking 'package' " of real property tax reform (22 Cal.3d at p. 231). Another such claim was rejected in *Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d 33, which passed on the measure enacting the Political Reform Act of 1974, a "comprehensive[]" and "detail[ed]" scheme (25 Cal.3d at p. 41 (plur. opn.)) "concern[ing] elections and different methods

for preventing corruption and undue influence in political campaigns and governmental activities" (*id.* at p. 37 (plur. opn.)). Yet another such claim was unanimously rejected in *Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d 805, in which provisions allowing insurance agents to give rebates to consumers and permitting banks to sell insurance were held not to embrace a "subject" different from the balance of the measure, which dealt with making insurance more affordable and available. Finally, a claim under the single-subject rule for statutes was unanimously rejected in *Metropolitan Water Dist.* v. *Marquardt, supra,* 59 Cal.2d 159, which considered a bond act comprising an integrated scheme for the development of the state's water resources.

By contrast, a single-subject challenge was unanimously sustained in *California Trial Lawyers Assn.* v. *Eu, supra,* 200 Cal.App.3d 351. There the court held that the self-styled "Insurance Cost Control Initiative of 1988," which was supported by the insurance industry, embraced more than one subject: one of the measure's sections would have provided that there was no limitation on campaign contributions by insurers and others and that state elected officials receiving such contributions were not disqualified from participating in decisions affecting a contributor's interests. Similar claims of violations under the single-subject rule for statutes were unanimously upheld in *Harbor* v. *Deukmejian, supra,* 43 Cal.3d 1078, and *Planned Parenthood Affiliates* v. *Swoap, supra,* 173 Cal.App.3d 1187. In the former, this court held invalid Senate Bill No. 1379 (Stats. 1984, ch. 268, p. 1302 et seq.), which contained numerous sections enacting, amending, repealing, and otherwise affecting numerous code and statutory provisions. In the latter, the Court of Appeal held invalid a section of the Budget Act of 1985 that went beyond appropriating funds for authorized activities to amending the substantive law authorizing those activities.

In *California Trial Lawyers Assn.* v. *Eu, supra,* 200 Cal.App.3d 351, 360, the Court of Appeal effectively acknowledged that the proposed initiative measure there challenged was capable of bearing some label—so long as that label was defined broadly enough. Similar acknowledgments appear, more or less clearly, in *Harbor* v. *Deukmejian, supra,* 43 Cal.3d 1078, 1100-1101, and *Planned Parenthood Affiliates* v. *Swoap, supra,* 173 Cal.App.3d 1187, 1198-1201. In none of these cases, however, was such "capability" found sufficient.

Prominent by its absence from the foregoing analysis is, of course, the decision in *Brosnahan* v. *Brown, supra,* 32 Cal.3d 236. As noted, a bare majority of four justices to three rejected a single-subject challenge to Proposition 8, the self-styled "Victims' Bill of Rights." In my view, they erred. Instead of seeking to determine whether the measure comprised a single

subject in and of itself, they asked in essence whether it was capable of bearing some label. By so doing, they misstepped—fatally. As explained above, there is no measure, no matter how heterogeneous, that is incapable of bearing some label, so long as that label is defined broadly enough. Although they correctly recognized that the single-subject rule bars "grab-bag" initiatives (32 Cal.3d at p. 253), the majority failed to realize that Proposition 8 was manifestly such a measure. In an evident attempt to give effect to what they perceived to be the will of the people, they upheld Proposition 8 and effectively struck down the constitutional single-subject rule. They should have done the opposite: the former was passed with the approval of 56.4 percent of the voters (Statement of Vote, Prim. Elec. (June 8, 1982), p. 45), the latter with 67.2 percent (Statement of Vote, Gen. Elec. (Nov. 2, 1948), p. 24).

In summary, the single-subject rule requires an initiative measure to constitute a coherent enactment in and of itself. It is not enough for such a measure to be capable of bearing some label of indefinite scope. It follows that the "reasonably germane" test must contain as its ultimate criterion whether an initiative measure is internally interrelated as a whole and parts. A standard that focuses on whether the measure is capable of bearing some label is simply empty.

In light of the foregoing, the question whether Proposition 115 satisfies the single-subject rule practically answers itself. As explained above, the rule requires a coherent enactment. The test demands the parts to be reasonably germane to each other and to the whole. When that test is applied here, the conclusion is inescapable that the initiative fails to exhibit the necessary internal interrelationship. The measure is a veritable "grabbag of . . . enactments." (*Brosnahan* v. *Brown, supra*, 32 Cal.3d at p. 253.) To be sure, it is arguably not as capacious as the self-styled "California Bill of Rights" considered in *McFadden* v. *Jordan, supra*, 32 Cal.2d 330, nor does it contain as many heterogeneous items. But the fact remains, it is indeed a "grabbag."

One need only glance through the potpourri comprising the 31 sections of Proposition 115. The measure deals with the following subjects among others: postindictment preliminary hearings, the independence of state constitutional rights, the granting of constitutional rights to the prosecution, joinder, hearsay at preliminary hearings, "reciprocal" discovery, voir dire, voir dire pilot projects, cross-examination of hearsay declarants at preliminary hearings, the felony-murder rule, procedural and substantive law relating to special circumstances, the corpus delicti of a felony-murder special circumstance, life imprisonment without possibility of parole for 16- and 17-year-old juveniles who commit special circumstance murders, a new

crime of torture, punishment for the new crime of torture, abrogation of the prosecution's duty to provide certain discovery in felony cases, offers of proof for defense witnesses at preliminary hearings, immediate writ review of delays in preliminary hearings, sufficiency of hearsay as a basis for probable cause at preliminary hearings, joinder of offenses and "cross-admissibility" of evidence, appointment of "ready" counsel, setting of trial in felony cases, maintenance of joinder of cases, rules for "reciprocal" discovery, prohibition against striking a special circumstance, abrogation of the prosecution's duty to provide certain discovery in misdemeanor cases, and immediate writ review of delays in felony trials. Further illustrative of the diversity of the subject matter is the fact that on occasion the Attorney General and other prosecutors have maintained that some provisions are prospective only, whereas others are retroactive.

In view of the foregoing, Proposition 115 must be held to violate the single-subject rule: it simply cannot be deemed a coherent enactment.

My colleagues, however, find no violation. They claim that "the single subject of Proposition 115 is promotion of the rights of actual and potential crime victims." (Maj. opn., *ante*, at p. 347.) That "subject," however, is nothing more than a label of indefinite scope, much like "government" or "public welfare." As explained, that a measure is capable of bearing such a label is not enough.

My colleagues further claim that "the various elements of Proposition 115 unite to form a comprehensive criminal justice reform package." (Maj. opn., *ante*, at p. 347.) But the summary they provide and the analysis they offer undermine their assertion and also demonstrate how great an understatement is their concession that "the provisions of Proposition 115 seem somewhat disparate" (*id*. at p. 348): the measure "comprehends" nothing more than its many and heterogeneous parts—in other words, it is again a "grabbag," no more, no less.

My colleagues also claim that "[a] subsidiary unifying theme underlying Proposition 115 is that all the . . . changes appear directed toward abrogating particular holdings of this court which the initiative's framers deemed unduly expansive of criminal defendants' rights." (Maj. opn., *ante*, at p. 347.) The presence of such a "unifying theme" cannot satisfy the single-subject rule. To hold in effect that animus could meet the requirement would effectively nullify the requirement itself. The reason is manifest: animus inheres in initiatives and is indeed their very soul (see generally Key & Crouch, *supra*, at pp. 442-458, 565-569, 571-576).

Therefore, I would hold that Proposition 115 "embrac[es] more than one subject" in violation of the single-subject rule and as a result does "not . . . have any effect." (Cal. Const., art. II, § 8, subd. (d).)

For the reasons stated above, although I join my colleagues in striking down section 3 of Proposition 115 as an unconstitutional revision of our fundamental law, I would go beyond them to invalidate the measure in its entirety as violative of the single-subject rule.

Respondents' petition for a rehearing was denied February 14, 1991.