Filed 6/6/16

# IN THE SUPREME COURT OF CALIFORNIA

EDMUND G. BROWN, JR.,
as Governor, etc., et al.,

        Petitioners,

        v.

THE SUPERIOR COURT OF
SACRAMENTO COUNTY,

        Respondent;

CALIFORNIA DISTRICT ATTORNEYS
ASSOCIATION et al.,

        Real Parties in Interest.

S232642

Here we consider the scope of Elections Code provisions enacted in 2014, which created a new process by which a proposed initiative measure is submitted for public comment. (Elec. Code, § 9002.)[1] After the comment period, the Attorney General prepares an official circulating title and summary, including an estimate of the measure's fiscal impact. (§ 9004.) The proponents may then solicit signatures to qualify their measure for the ballot.

---

[1] Further statutory references are to the Elections Code, unless otherwise designated. We shall refer to the subdivisions of section 9002 as sections 9002(a) and 9002(b).

SEE DISSENTING OPINION

The Legislature specified that any amendments to a measure submitted for comment must be "reasonably germane to the theme, purpose, or subject of the initiative measure as originally proposed." (§ 9002(b).) In this case, proponents decided to amend their measure, deleting some provisions and adding others that were supported by Governor Edmund G. Brown, Jr. Challengers sought a writ of mandate requiring the Attorney General to reject the amendments. The trial court granted the writ, finding that the revised measure failed to meet the requirements of section 9002. The proponents, joined by the Governor, sought emergency relief in this court. We temporarily stayed the trial court's judgment and issued an order to show cause. We now grant the requested relief and direct the trial court to vacate its judgment.

As discussed in detail below, the legislative history and statutory language demonstrate that the Legislature intended the comment period to facilitate feedback, not to create a broad public forum. Nor did the Legislature preclude substantive amendments. It required only that any amendments be "reasonably germane" to the original measure's aims. (§ 9002(b).) While the new process imposes time constraints on various governmental functions, the constraints are similar to those that existed under the former statutory scheme. In particular, the Legislature continued existing law relating to fiscal analyses of the impacts of proposed measures.

## I. BACKGROUND

Section 9002(a) requires the Attorney General to post the text of proposed initiative measures on her Web site for a 30-day public comment period.[2] On

---

[2] Section 9002(a) provides: " Upon receipt of a request from the proponents of a proposed initiative measure for a circulating title and summary, the Attorney

*(Footnote continued on next page.)*

2

December 22, 2015, proponents Margaret R. Prinzing and Harry A. Berezin submitted "The Justice and Rehabilitation Act." The act declared it was intended to "ensure that California's juvenile and criminal justice systems effectively stop repeat offending and improve public safety." The first of its listed purposes was to "[e]nsure that California's juvenile and criminal justice system resources are used wisely to rehabilitate and protect public safety [*sic*]." The measure proposed statutory amendments to accomplish the following:

(1) Abolish the requirement that minors 14 years or older be prosecuted as adults for certain serious offenses. Eliminate the discretion of district attorneys to file charges against juveniles in adult court. Establish 16 as the minimum age at which juveniles may be transferred to adult court. Require a judicial transfer hearing in all cases. Specify a number of serious crimes for which juveniles may be committed to the Division of Juvenile Facilities.

---

*(Footnote continued from previous page.)*

General shall initiate a public review process for a period of 30 days by doing all of the following:

"(1) Posting the text of the proposed initiative measure on the Attorney General's Internet Web site.

"(2) Inviting, and providing for the submission of, written public comments on the proposed initiative measure on the Attorney General's Internet Web site. The site shall accept written public comments for the duration of the public review period. The written public comments shall be public records, available for inspection upon request pursuant to Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code, but shall not be displayed to the public on the Attorney General's Internet Web site during the public review period. The Attorney General shall transmit any written public comments received during the public review period to the proponents of the proposed initiative measure."

(2)  Allow minors convicted of crimes in adult court to move for a juvenile disposition instead of a prison sentence, and make various other changes to the process of juvenile dispositions and commitments.

(3)  Eliminate the prohibition against the sealing of juvenile court records, and permit the sealing or destruction of such records.

(4)  Alter parole suitability review for prisoners who were under 23 years of age at the time of their "controlling offense" in two respects:  sentence enhancements would no longer be included in determining the term of imprisonment for purposes of identifying the "controlling offense," and "Three Strikes" offenders would no longer be excluded from such parole suitability review.  (See Pen. Code, § 3051.)

The proponents of  The Justice and Rehabilitation Act received no online comments from the public.  However, during the comment period they spoke with a number of individuals and groups interested in justice reform, including members of the Governor's staff.  A political action committee supporting the measure engaged in discussions with numerous interest groups, including the California District Attorneys Association (CDAA).  The Governor and his staff were significantly involved in these discussions as well.

On January 25, 2016, after the close of the public comment period but within the ensuing five-day window for accepting amendments, the proponents submitted a revised measure, retitling it "The Public Safety and Rehabilitation Act of 2016."[3]  Among the declared purposes of the amended measure were to

---

[3]    Section 9002(b) provides:  "During the public review period, the proponents of the proposed initiative measure may submit amendments to the measure that are reasonably germane to the theme, purpose, or subject of the initiative measure as originally proposed.  However, amendments shall not be

*(Footnote continued on next page.)*

"[p]rotect and enhance public safety," "[s]ave money by reducing wasteful spending on prisons," and "stop the revolving door of crime by emphasizing rehabilitation, especially for juveniles." The new measure retained the original provisions eliminating district attorneys' discretion to file charges against juveniles in adult court and requiring a judicial hearing to determine whether a transfer of jurisdiction is warranted. Transfers were generally limited to minors aged 16 or older, but were permitted for 14 or 15 year olds accused of certain serious crimes. All other original provisions were deleted, and new provisions were added.

The original proposal to amend Penal Code section 3051, governing parole hearings for prisoners under the age of 23 at the time of their offenses, was replaced with a constitutional amendment that would significantly modify parole consideration for *all* state prisoners "convicted of a non-violent felony offense." These prisoners would be eligible for parole consideration after completing "the

---

*(Footnote continued from previous page.)*

submitted if the initiative measure as originally proposed would not effect a substantive change in law.

"(1) An amendment shall be submitted with a signed request by all the proponents to prepare a circulating title and summary using the amended language.

"(2) An amendment shall be submitted to the Attorney General's Initiative Coordinator located in the Attorney General's Sacramento Office via United States Postal Service, alternative mail service, or personal delivery. Only printed documents shall be accepted; facsimile or email delivery shall not be accepted.

"(3) The submission of an amendment shall not extend the period to prepare the estimate required by Section 9005.

"(4) An amendment shall not be accepted more than five days after the public review period is concluded. However, a proponent shall not be prohibited from proposing a new initiative measure and requesting that a circulating title and summary be prepared for that measure pursuant to Section 9001."

The timeliness of the submission here has not been challenged.

5

full term" for their "primary offense," defined as "the longest term of imprisonment imposed by the court for any offense, excluding the imposition of an enhancement, consecutive sentence, or alternative sentence." The Department of Corrections and Rehabilitation would be authorized to award credits for good behavior and rehabilitative or educational achievements, and to adopt implementing regulations.

The Attorney General examined the amended measure, determined it was "reasonably germane" to the original, and began preparing a circulating title and summary. (§ 9002(b).) On February 11, 2016, the Legislative Analyst issued a summary of the measure's fiscal impacts. (See § 9005, subd. (a).) The same day, CDAA sought a writ of mandate to restrain the Attorney General from proceeding with the measure.[4]

The trial court granted the writ, ruling that the Attorney General abused her discretion by accepting the amendments as "reasonably germane" to the original measure. (§ 9002(b).) The court found that the "theme and purpose of the original initiative was reform of the juvenile justice system," whereas the amended version "deals primarily with reform of the adult justice system." The court also ruled that the "purpose and intent of [section] 9002" were violated because the public was deprived of the opportunity to comment on the amended measure.

The Governor and the proponents of the measure sought emergency relief in this court, based on the shortness of time remaining for collecting signatures to qualify the measure for the ballot. We stayed the trial court's judgment and ordered CDAA to show cause why the requested relief should not be granted.

---

[4] CDAA was joined by Anne Marie Schubert, District Attorney of Sacramento County. Hereafter, we refer to these parties jointly as CDAA.

6

## II. DISCUSSION

As noted, the Elections Code limits the extent to which a proposed measure may be amended once it is posted for public comment. Amendments must be "reasonably germane to the theme, purpose, or subject of the initiative measure as originally proposed." (§ 9002(b).) CDAA argues that the trial court's judgment honors the terms and purposes of section 9002. It contends the statute was intended to enhance the transparency of the initiative process by giving the public a meaningful opportunity to review and comment on proposed measures. It reasons that this opportunity is lost if a measure is replaced with a dramatically different version never exposed to public comment. It claims such a substitution deprives the Legislative Analyst of the time needed to prepare a fiscal estimate, the Attorney General of the time needed to properly prepare a circulating title and summary, and potential opponents of the time needed to mount a campaign against the initiative. CDAA suggests the Legislature contemplated only amendments to correct drafting errors and legal flaws, and urges us to construe the "reasonably germane" standard accordingly. Finally, CDAA contends that even if the standard is applied broadly, the changes made in this initiative measure are not "reasonably germane" to the original proposal under section 9002(b).

With regard to the purposes of the statutory scheme and the time frames it imposes, the legislative history is instructive. After reviewing that history, we will turn to the "reasonably germane" standard and its application here.

A. *Section 9002 in the Light of Legislative History*

The Legislature is authorized to "provide the manner in which petitions shall be circulated, presented, and certified, and measures submitted to the electors." (Cal. Const., art II, § 10, subd. (e).) It first addressed the subject of amendments to proposed initiative measures in 1976, when it revised former section 3503. The Attorney General was directed to "provide a copy of the title

7

and summary to the Secretary of State . . . within 15 days after receipt of the fiscal estimate or opinion." [5] (Former § 3503, as amended by Stats. 1976, ch. 1278, § 1, p. 5670.) The amended statute provided: "If during the 15-day period, the proponents of the proposed initiative measure submit amendments, other than technical, nonsubstantive amendments, to the final version of such measure, the Attorney General shall provide a copy of the title and summary to the Secretary of State within 15 days after receipt of such amendments." (*Ibid.*) Thus, the Legislature placed no restriction on the nature of the amendments proponents might submit, providing only that if substantive changes were made, a new 15-day period would begin for the Attorney General to prepare a title and summary.

That statutory regime remained in place for 39 years. The operative provisions were transferred to section 9004 in 1994, and to section 9002(a) in 2009. (Stats. 1994, ch. 920, § 2, p. 4915; Stats. 2009, ch. 373, § 8.) In 2014, the Legislature enacted the provisions now before us as part of Senate Bill Number

---

[5] Since 1968, the Attorney General has been required to include information about the fiscal impact of an initiative measure along with the circulating title and summary. (Stats. 1968, ch. 1444, § 1, p. 2855, enacting former § 3501.3.) The Department of Finance and the Joint Legislative Budget Committee were originally responsible for providing this information. In 1975, the Legislature created an alternative for circumstances when, in the view of the responsible entities, a "reasonable estimate . . . cannot be prepared" within the time allowed, which was then 25 days from receipt of the final version of the proposed initiative by the Attorney General. (Former § 3501.3, as amended by Stats. 1975, ch. 955, § 1, p. 2133.) In such cases, the entities were required to provide "their opinion as to whether or not a substantial net change in state or local finances would result if the proposed initiative is adopted." (*Ibid.*) The "opinion" alternative has been a consistent feature of the scheme, and is now found in section 9005. (See Stats. 1976, ch. 248, § 3, p. 490, renumbering the provision as former § 3504; Stats. 1976, ch. 1278, § 2, pp. 5670-5671, amending former § 3504; Stats. 1992, ch. 232, § 2, p. 1024; Stats. 1994, ch. 920, § 2, pp. 4915-4916, renumbering the provision as § 9005; Stats. 2009, ch. 485, § 1.5.)

1253 (2013-2014 Reg. Sess.) (Bill No. 1253).  The bill was revised a number times before passage.

As originally proposed, the 2014 amendments included provisions requiring the Attorney General to initiate a 30-day public comment period by posting the text of a proposed initiative on her website.  The first version instructed the Attorney General to "[p]romot[e] public participation by inviting on the Web site written public comments on the proposed initiative measure.  The site shall accept written public comments for the duration of the public review period.  Public comments may address perceived errors in the drafting of, or perceived unintended consequences of, the proposed initiative measure.  The Attorney General shall transmit any written public comments received during the public review period to the proponents of the proposed initiative measure."  (Bill No. 1253, as introduced Feb. 20, 2014, § 5.)  Section 9002(b) said simply, "[d]uring the public review period, the proponents of the proposed initiative measure may submit amendments to the measure."  (Bill No. 1253, as introduced Feb. 20, 2014, § 5.)  Section 9002(b)(3) specified, as it does now, that "[t]he submission of an amendment *shall not extend* the period to prepare the estimate required by Section 9005."[6]  (Bill No. 1253, as introduced Feb. 20, 2014, § 5, italics added.)

---

[6]     Section 9005 was also amended by Bill Number 1253.  The Legislative Analyst was substituted for the Joint Legislative Budget Committee as an entity responsible for evaluating a proposed measure's fiscal impact.  (§ 9005, subd. (b), as amended by Stats. 2014, ch. 697, § 7, pp. 4601-4602.)   The time for preparing an estimate or opinion, formerly 25 working days from receipt of the "final version" of a measure from the Attorney General (see Stats. 2009, ch. 373, § 11, pp. 4218-4219), was changed to 50 days from receipt of "the proposed initiative measure."  (§ 9005, subd. (c), as amended by Stats. 2014, ch. 697, § 7, p. 4601.) Otherwise, the substance of the fiscal estimate requirements remains the same as it has been since 1975.  (See fn. 5, *ante*, p. 8.)  The entities are tasked with producing either an "estimate of the amount of any increase of decrease in

*(Footnote continued on next page.)*

Section 9002(b)(4) was not modified during the legislative process. It states: "An amendment shall not be accepted more than five days after the public review period is concluded. However, a proponent shall not be prohibited from proposing a new initiative measure and requesting that a circulating title and summary be prepared for that measure pursuant to Section 9001." (Bill No. 1253, as introduced Feb. 20, 2014, § 5.) The provisions governing the time for the Attorney General to prepare a circulating title and summary were set out in section 9004, subdivision (b), which also was enacted as originally framed: "The Attorney General shall provide a copy of the circulating title and summary and its unique numeric identifier to the proponents and to the Secretary of State within 15 days after receipt of the fiscal estimate or opinion prepared by the Department of Finance and the Legislative Analyst pursuant to Section 9005." (Bill No. 1253, as introduced Feb. 20, 2014, § 6.)

The first bill analysis that appears in the legislative history was prepared for a hearing on the first amended version. None of the amendments affected the statutes relevant here, but the author of the legislation commented: "Presently, there is not a sufficient review process of initiatives by the public or the Legislature where either is able to provide greater input and suggest amendments or correct flaws before the measure is printed on the ballot. Implementing a better public review process before the title and summary process by the [Attorney

_____

*(Footnote continued from previous page.)*

revenues or costs to the state of local government," or if an estimate "cannot be prepared within the 50-day period . . . their opinion as to whether or not a substantial net change in state or local finances would result if the proposed initiative measure is adopted." (§ 9005, subds. (a), (c).)

10

General] . . . helps address this deficiency." (Sen. Com. on Elections and Constitutional Amendments, Analysis of Bill No. 1253, as amended Apr. 9, 2014, p. 6.) Other comments provided a summary of related legislation, which noted: "[Assembly Bill Number] 1245 (Laird) of 2003, would have similarly allowed for a 30-day public examination/comment period prior to the [Attorney General] drafting the title and summary. [Assembly Bill Number] 1245 was vetoed by former Governor Gray Davis who stated in relevant part: 'I am concerned that an initiative could receive either a negative or positive comment while displayed on the [Secretary of State's] web site; the proponents may then revise the initiative, but [are] not required to repost it. Consequently, the public may see one version of the initiative prior to the election and an entirely different initiative during the election.' " (*Ibid*.)[7]

The provisions governing the public comment period were then revised to read as they do today. The Attorney General is required to "[i]nvit[e], and provid[e] for the submission of, written public comments on the proposed initiative measure" on her Web site, and "[t]he site shall accept written public comments for the duration of the public review period." (§ 9002(a)(2), as

---

**7** A copy of Governor Davis's 2003 letter to the Assembly declining to sign Assembly Bill Number 1245 (2003-2004 Reg. Sess.) is included in the bill file maintained by the Senate Committee on Elections and Constitutional Amendments. In addition to the language quoted above, the letter observed: "This bill would require the Attorney General (AG) to forward a draft copy of a proposed initiative to the Secretary of State (SOS). SOS is then required to post the draft, including the names of the proponents, on its web site for 30 days to facilitate public comment on the measure. The public comments will be retained on the web site for 90 days. After 120 days, proponents have the option to direct the AG to prepare the draft as originally presented, a revised draft, or [post] a revised draft on SOS's web site for another 30 days." (Governor's Veto message to Assem. on Assem. Bill No. 1245 (Oct. 12, 2003) 3 Assem. J. (2003-2004 Reg. Sess.) p. 4012.)

11

amended by Bill No. 1253 on June 17, 2014, § 5.)  However, the comments are not displayed on the site.  Instead, "[t]he Attorney General shall transmit any written public comments received during the public review period to the proponents of the proposed initiative measure."  (*Ibid*.) [8]  The following statement was removed from section 9002(a)(2) and added to Bill No. 1253's uncodified findings and declarations:  "Public comment may address perceived errors in the drafting of, or perceived unintended consequences of, the proposed initiative measure."  (Bill No. 1253, as amended June 17, 2014, § 2, subd. (b)(3), 5.)  The provisions governing amendments were not changed at this time.

In a subsequent bill analysis, the following criticisms were directed against section 9002's treatment of amendments:  "<u>Possibility of 'Spot' Initiatives</u>: During the public review period, this bill permits proponents of a proposed initiative measure to submit amendments to the measure.  However, this bill does not place any limitation on the amendments submitted by the proponents.  Consequently, this bill does not prevent a proponent from receiving public comments on the text of a 'spot' initiative, and then submitting a substantially revised initiative text to the [Attorney General] after the 30 day public comment period for the ballot title and summary preparation.  This scenario renders the public review process meaningless.  Moreover, the proponents of a proposed measure could do this and circumvent paying another $200 filing fee.

"Furthermore, because this bill does not prevent the submission of a 'spot' initiative, the time period that the Legislative Analyst and DOF [the Department of Finance] have to prepare the fiscal estimate could be negatively impacted.  This

---

[8]     The statute designates the comments "public records, available for inspection upon request pursuant to [the California Public Records Act]." (§ 9002(a)(2).)

12

bill, which extends the time for the DOF and the Legislative Analyst to prepare the fiscal estimate from 25 working days to 50 days, also permits the proponents to submit amendments 5 days after the 30 day public review period.  As a result, if the proponents submit an amendment that substantively changes the initiative text, the DOF and Legislative Analyst will only have 15 days to prepare a new fiscal estimate." (Assem. Com. on Elections and Redistricting, Analysis of Bill No. 1253, as amended June 17, 2014, p. 10.)

Thereafter, section 9002(b) was revised to add the following italicized language:  "During the public review period, the proponents of the proposed initiative measure may submit amendments to the measure *that further its purposes, as determined by the Attorney General*." (Bill No. 1253, as amended July 1, 2014, § 5.)  The provision was amended again a month later:  "During the public review period, the proponents of the proposed initiative measure may submit amendments to the measure *that are reasonably germane to the theme, purpose, or subject of the initiative measure as originally proposed.  However, amendments shall not be submitted if the initiative measure as originally proposed would not effect a substantive change in law*." (§ 9002(b), italics added, as amended by Bill No. 1253 on Aug. 4, 2014, § 5.)  No further changes were made to the relevant provisions.

The evolution of the governing statutes, as set forth above, puts to rest CDAA's arguments about the purposes of section 9002.  While the Legislature intended to improve the initiative process by allowing members of the public to make suggestions to proponents, it did not establish a public forum for comments or provide a broadly transparent amendment process.  Nor did the Legislature limit proponents to amendments correcting drafting errors or "legal flaws," as CDAA suggests.  In its originally proposed form, the statute permitted amendments without *any* limitation as to their substance, consistent with the state of the law

13

since 1977.  The sponsor of the bill informed his fellow legislators that the new public comment period was intended to allow the public to suggest amendments *or* correct flaws.

When it was noted that an earlier proposal for a 30-day public comment period had been vetoed, out of concern that the public might be asked to vote on an initiative measure that was entirely different from the one posted for comment, the statute was amended to specify that comments were not to be posted online for public review, as they would have been under the vetoed legislation.  (See fn. 7, *ante*, p. 11.)  They were simply to be sent to the measure's proponents.  At the same time, language suggesting that public comments were meant to address perceived errors and unintended consequences was taken out of the operative provisions of section 9002 and moved to an uncodified section of Bill Number 1253.  Thus, while corrections of this nature are among the contemplated purposes of the statute, the drafters went out of their way to avoid any implication in section 9002 that they are the *only* reason for enabling public comments.

When more pointed objections were raised that the proposed legislation placed no restriction on amendments, allowing extensive alterations that would render the public comment period "meaningless," the statute was *not* revised to limit amendments to nonsubstantive changes.  Such a restriction would have been a natural one because it was part of existing law, which provided no extension of time for the Attorney General to prepare a title and summary after nonsubstantive amendments.  (Former § 9002(a); see Stats. 2009, ch. 373, § 8, p. 4218.)  Instead, the statute was initially altered to require the Attorney General to determine whether amendments furthered the purposes of the original measure.[9]  Shortly

---

[9]    This standard, like the "reasonably germane" test that was finally adopted, was drawn from existing law governing initiative measures.  "It is common for an

*(Footnote continued on next page.)*

thereafter, that requirement was dropped and section 9002(b) was given its current form.  The limitation imposed on amendments is a lenient one:  they must be "reasonably germane to the theme, purpose, or subject of the initiative measure as originally proposed."  (§ 9002(b).)

So-called "spot initiatives" are addressed by a provision barring amendments "if the initiative measure as originally proposed would not effect a substantive change in law."  (§ 9002(b).)  CDAA, however, takes issue with the policy of allowing substantive amendments to *any* initiative measure.  It argues that permitting such amendments facilitates maneuvers akin to the legislative practice of gutting and amending a proposed bill.  CDAA does not define what it means by "gut and amend," but presumably it refers to instances where the contents of a bill are deleted and replaced with different provisions at a late stage, bypassing the usual legislative process.  That is not an apt analogy to the procedures established by section 9002, which provides for public comment as an *initial* step.  The usual process for initiative measures follows:  the measure is circulated for signatures, placed on the ballot if sufficient signatures are gathered, and subjected to the tests of the campaign season.

At the early stage addressed in section 9002, the Legislature intentionally left ample room for proponents to make substantive changes.  It squarely considered, and was not moved by, the possibility that a measure emerging from

*(Footnote continued from previous page.)*

initiative measure to include a provision authorizing the Legislature to amend the initiative without voter approval *only if the amendment furthers the purpose of the initiative*."  (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251, italics added; see Cal. Const., art. II, § 10, subd. (c) [Legislature may amend initiative statute only if statute so provides].)  We have construed this limitation strictly.  (*Amwest*, at pp. 1255-1256.)

15

the public comment process would be significantly different from the original. By ensuring that comments would not be posted, but transmitted directly to the proponents, the Legislature signaled its intent that comments are for the benefit of proponents, not for the purpose of fostering public discussion. It could have, but did not, require proponents to respond to comments or to post amendments for a second round of comment. CDAA's objection that this procedure does not serve the purpose of transparency fails to acknowledge that the avenue for public comment laid out by the Legislature runs only one way, and for only one round of suggestions.[10]

The legislative history also undermines CDAA's arguments concerning the time frames allowed by the statutory scheme. Although the drafters of section 9002 were warned that it might leave as little as 15 days for the preparation of a fiscal estimate, they did not respond by expanding the time allowed. To the contrary, they retained a provision stating that the time for preparing the estimate would *not* be extended by the submission of amendments. (§ 9002(b)(3).) No unreasonable burden was thereby imposed. The Legislature was familiar with the existing provisions of section 9005, subdivision (c), which explicitly permit the responsible entities to provide an *opinion* of a measure's fiscal impact if they deem the time too short for preparation of an *estimate*. The Legislature also knew

---

[10]     We note that other provisions enacted by Bill Number 1253 further the interests of transparency, particularly the new requirement that the Secretary of State create a Web site consolidating information about all state ballot measures "in a manner that is easy for voters to access and understand." (§ 9082.7, subd. (b), as amended by Stats. 2014, ch. 697, § 14.) The required information includes a summary of each measure, the amount of contributions in support and opposition, a list of the top 10 contributors in support and opposition, a list of committees that support or oppose, and access to online information about the top 10 contributors of at least a million dollars to any committee. (§ 9082.7, subd. (b), as amended by Stats. 2014, ch. 697, § 14.)

16

that if a measure qualifies for the ballot, a more thorough statement of its fiscal impacts is prepared by the Legislative Analyst and summarized by the Attorney General for inclusion on the ballot. (§§ 9051, 9087; Gov. Code, § 88003.) Thus, the Legislature was satisfied that existing law adequately addresses the concerns raised by CDAA over the time for preparing a fiscal estimate.

CDAA further objects that the Attorney General is entitled to 65 days to prepare a circulating title and summary, which she will not have if a measure is substantially amended after submission. CDAA arrives at this 65-day period by adding the 50 days provided for preparation of a fiscal estimate under section 9005, subdivision (c) to the 15 days permitted by section 9004, subdivision (b) for preparing a title and summary after receipt of the fiscal estimate. However, under the long-standing statutory scheme replaced by Bill Number 1253, the Attorney General was given only 15 days to produce a title and summary after receiving substantive amendments to a proposed initiative measure. (See former § 9002(a); Stats. 2009, ch. 373, § 8.) The new statutes actually allow more time. The comment period is 30 days, followed by five days for accepting amendments. Even if an amendment is accepted on the 35th day, there are 15 days remaining for the preparation of a fiscal estimate or opinion, and the Attorney General has an *additional* 15 days to perform her functions after obtaining the fiscal report. (§§ 9004, subd. (b), 9005, subd. (c).)

Finally, there is no merit in CDAA's claim that allowing amendments to the substance of a measure after the public comment period deprives opponents of time to mount a campaign. Opponents can use the comment period to communicate their objections to proponents. Thereafter, they have ample opportunities to make their case during the lengthy process of signature gathering, ballot qualification, and the election itself.

B.  *The "Reasonably Germane" Standard*

Section 9002(b)'s provision requiring amendments by proponents to be "reasonably germane to the theme, purpose, or subject of the initiative measure as originally proposed" is plainly taken from our case law applying the constitutional requirement that "[a]n initiative measure embracing more than one subject may not be submitted to the electors or have any effect" (Cal. Const., art II, § 8, subd. (d).)  We have long held that the constitutional "single subject" rule is satisfied "so long as challenged provisions meet the test of being *reasonably germane* to a common theme, purpose, or subject."  (*Californians for an Open Primary v. McPherson* (2006) 38 Cal.4th 735, 764 (*McPherson*), and cases cited.)  This standard reflects our " 'liberal interpretative tradition . . . of sustaining statutes and initiatives which fairly disclose a reasonable and common sense relationship among their various components in furtherance of a common purpose.' " (*Legislature v. Eu* (1991) 54 Cal.3d 492, 512, quoting *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 253.)

CDAA does not dispute the derivation of the "reasonably germane" standard.  It urges, however, that the standard operates differently in this statutory context than it does under the Constitution.  Section 9002(b) requires an amendment to be "reasonably germane to the theme, purpose, or subject of the initiative measure *as originally proposed*" (italics added), whereas an initiative measure will pass the constitutional single subject test "so long as challenged provisions meet the test of being reasonably germane to a *common* theme, purpose, or subject" (*McPherson*, *supra*, 38 Cal.4th at p. 764, italics added and deleted).  We agree that the frame of reference is different in the two contexts, though the difference may be a subtle one.  Under section 9002(b), a proponent's amendment is compared with the original measure.  Under the single subject rule, the various internal parts of a measure are examined for their relationship to an

18

overarching objective. In *McPherson*, at p. 764, fn. 29, we observed that whether provisions are reasonably germane to *each other* and whether *all* provisions are reasonably germane to a common theme, purpose, or subject are different, but related questions. Thus, as both sides here recognize, we are not reviewing "The Public Safety and Rehabilitation Act of 2016" for compliance with the single subject rule.

Even though the focus of the test is different under section 9002(b), the Legislature's adoption of the terms "reasonably germane" and "theme, purpose, or subject" is significant. It could have used synonyms, such as "rationally related" and "concern, objective, or topic." Instead it chose terms of art with which it is quite familiar, given that the "reasonably germane" standard also governs the separate single subject requirement applicable to legislative enactments. (Cal. Const., art. IV, § 9 ["A statute shall embrace but one subject . . . .]; *McPherson*, *supra*, 38 Cal.4th at p. 764.) The Legislature was well aware that in the constitutional context, these terms have been applied "in an accommodating and lenient manner so as not to unduly restrict the Legislature's or the people's right to package provisions in a single bill or initiative." (*McPherson*, at p. 764.)

There is no reason to suppose the Legislature contemplated a more limited meaning for "reasonably germane" and "theme, purpose, or subject" under the statute. It is a venerable principle that when a word or phrase appearing in a statute "has a well-established *legal* meaning, it will be given that meaning in construing the statute. This has long been the law of California: 'The rule of construction of statutes is plain. Where they make use of words and phrases of a well-known and definite sense in the law, they are to be received and expounded in the same sense in the statute.' (*Harris v. Reynolds* (1859) 13 Cal. 514, 518.) [¶] This rule has been declared in our basic codes since they were first enacted in 1872. (Civ. Code, § 13 [words and phrases are to be construed according to

19

'approved usage,' but 'such others as may have acquired a peculiar and appropriate meaning in law . . . are to be construed according to such peculiar and appropriate meaning']; accord, Code Civ. Proc., § 16; Pen. Code, § 7, subd. 16; Prob. Code, § 21122.)"  (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 19.)

Accordingly, we review this proposed measure remembering "that the initiative process occupies an important and favored status in the California constitutional scheme," and therefore the "reasonably germane" standard "should not be interpreted in an unduly narrow or restrictive fashion."  (*Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1157, and cases cited.)  We have consistently deemed it our duty to guard the people's right to exercise the initiative power.  (*Id*. at p. 1168.)  The proponents of an initiative measure are captains of the ship when it comes to deciding which provisions to take on board.  In section 9002, the Legislature has granted them substantial leeway to make amendments before the measure is presented to the public for signatures.  The statute permits even sweeping changes, so long as they are reasonably germane to the theme, purpose, or subject of the original proposal.

With these guidelines in mind, we apply section 9002(b) to the amendments at issue.  As noted, the amended version of the initiative measure requires a judicial transfer order before a minor can be prosecuted as an adult and sets age limits for such a transfer.  CDAA does not dispute that these provisions are reasonably germane to the very similar ones found in the original measure.  It concedes that the deletion of other original provisions applying to juvenile dispositions, commitments, and records was a reasonably germane amendment. CDAA's arguments center on fact that the proponents replaced their original amendment of Penal Code section 3051 with a broader constitutional amendment.

Before comparing the terms of the original and amended proposals, we address CDAA's argument that the original submission was concerned with

20

juvenile justice, while the amendments were concerned with the adult criminal justice system. The claim fails. Both as it now exists and as it would have been amended by the initially proposed measure, Penal Code section 3051 applies *only* to inmates in state prison, not juvenile facilities. CDAA contends the amendments to Penal Code section 3051 were merely "collateral" to the juvenile justice reforms of the original measure. It relies on *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 578, a single subject case in which we held that provisions expanding the list of Three Strikes offenses were "collateral" to other provisions addressing gang and juvenile offenses. *Manduley* is inapposite. Here the parole reforms were central to the proponents' original submission, which was prefaced by the declaration: "Evidence shows that authorizing judges and parole boards to consider release of individuals that have become rehabilitated reduces waste and incentivizes rehabilitation." We note that even the provisions of the original measure governing the prosecution of minors in adult court, which were retained by the amended version in substantially similar form, would have had a significant effect on adult courts and correctional facilities.

The originally submitted statutory amendment proposed changes to the parole suitability review process for prisoners under the age of 23 at the time of their offense. It had two components: eliminating enhancements from the calculation of the relevant term of imprisonment, and removing the bar against parole hearings for Three Strikes offenders. The newly proposed constitutional provision also addresses parole suitability review. It would be significantly *more* restrictive in one way, because it would apply only to prisoners convicted of non-violent felonies. It would be significantly *less* restrictive in another way, because it would apply to all prisoners regardless of their age at the time of the offense. It

21

would also authorize the Department of Corrections and Rehabilitation to award credits for good behavior and rehabilitation.**11**

Given the "accommodating and lenient" review to which the proponents are entitled (*McPherson*, *supra*, 38 Cal.4th at p. 764), we cannot say the amended measure is not reasonably germane to the theme, purpose, or subject of the original. Both proposals address parole suitability review for inmates in state prison, with an eye toward making such review available at an earlier stage than under existing law. Both accomplish this objective by removing enhancements from the calculation of parole review dates. Neither makes any change in the determinate sentencing statutes per se. Both are intended to benefit prisoners who have rehabilitated themselves in custody, and to reduce the costs of incarceration.**12**

---

**11** We emphasize two points we have made before when reviewing initiative measures. We pass no judgment on the wisdom, efficacy, or soundness of the proposal before us. (*Brosnahan v. Brown*, *supra*, 32 Cal.3d at p. 248; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 228-229.) And we give no consideration to "possible interpretive or analytical problems" that might arise should the measure become law. (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 341.) Our review is limited to the points necessary to resolve the basic questions before us. (*Ibid*.; see *Brosnahan*, at p. 241["we neither consider nor anticipate possible attacks, constitutional or otherwise, which in the future may be directed" at the measure].)

**12** Among the stated purposes of the original Justice and Rehabilitation Act were to "ensure that California's juvenile and criminal justice systems effectively stop repeat offending and improve public safety," and "[e]nsure that California's juvenile and criminal justice system resources are used wisely to rehabilitate and protect public safety [*sic*]." The amended Public Safety and Rehabilitation Act of 2016 declares that it was intended to "[p]rotect and enhance public safety," "[s]ave money by reducing wasteful spending on prisons," and "stop the revolving door of crime by emphasizing rehabilitation, especially for juveniles." In the single subject context, we have consulted the stated purposes of initiative measures to determine whether their various provisions were reasonably germane to a common

*(Footnote continued on next page.)*

CDAA places great reliance on the fact that the original proposal would have provided hearings only for a younger class of offenders. However, as the proponents point out, some offenders covered by the original proposal are serving Three Strikes sentences. Those prisoners would have been middle-aged by the time they received parole suitability review. The amended version would apply to the same class of offenders, so long as their offense was nonviolent. It would include others of the same age or younger who are serving shorter sentences, as well as older inmates who have completed the full term for their primary offense. The theme, purpose, and subject of the original measure are easily recognizable in the amended version, even though it would allow parole hearings for offenders regardless of their age at the time of their offenses.

CDAA objects that the amended version would enact a broad constitutional provision, whereas the original would have amended a statute with narrower application. But the "reasonably germane" standard imposes no limit on the *scope* of amendments within range of the "theme, purpose, or subject" of the original proposal. (§ 9002(b).) In the single subject context, we have held that the standard does not preclude "comprehensive, broad-based reform in a particular area of public concern." (*Senate of the State of Cal. v. Jones*, *supra*, 21 Cal.4th at p. 1157.) We have also held that initiative measures combining significant constitutional amendments with statutory changes comply with the standard. (*Raven v. Deukmejian*, *supra*, 52 Cal.3d at pp. 346-347; *Brosnahan v. Brown*, *supra*, 32 Cal.3d at p. 242-245, 247.) By adopting the central terms from the

---

*(Footnote continued from previous page.)*

purpose. (E.g., *Manduley v. Superior Court*, *supra*, 27 Cal.4th at pp. 574, 576; *Brosnahan v. Brown*, *supra*, 32 Cal.3d at pp. 247-248.)

23

"reasonably germane" standard as it developed in single subject cases for use in section 9002(b), the Legislature indicated its intent to allow substantial changes by proponents, even constitutional amendments, after the public comment period.

CDAA makes a perfunctory argument that the substituted measure cannot be considered an "amendment" under section 9002(b). It relies on a Court of Appeal opinion applying the constitutional limitation on the *Legislature's* power to amend initiative measures. (*Franchise Tax Bd. v. Cory* (1978) 80 Cal.App.3d 772; Cal. Const., art. II, § 10, subd. (c).) In no way do we suggest that initiative proponents face similar limitations in deciding whether to amend their own proposals. We note, however, that the language relied on by CDAA would include the new proposal here as an "amendment": its " 'aim is to . . . reach situations which were not covered by the original.' " (*Cory*, at p. 777; see *People v. Kelly* (2010) 47 Cal.4th 1008, 1026, fn. 19.) Other authority quoted in *Cory* supports the same conclusion: "An amendment is '. . . any change of the scope or effect of an existing statute, whether by addition, omission, or substitution of provisions, which does not wholly terminate its existence, whether by an act purporting to amend, repeal, revise, or supplement, or by an act independent and original in form, . . .' (Sutherland, Statutory Construction (4th ed.1972) § 22.01, p. 105)." (*Cory*, at p. 776; see *Kelly*, at p. 1026, fn. 18.)

There is no question that the changes the proponents made to this initiative measure were, in certain respects, quite extensive. However, that is their right, so long as the changes are reasonably germane to the original theme, purpose, or subject. The amended measure, like the original, addresses the process for transferring minors to adult court for criminal prosecution, and expands parole suitability review for state prisoners. It meets the accommodating standard established in section 9002(b). Accordingly, the trial court erred in directing the Attorney General to reject the amended measure.

24

## III.  DISPOSITION

A peremptory writ of mandate shall issue, directing the trial court to vacate its judgment and enter a new order denying the relief sought by CDAA.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

**DISSENTING OPINION BY CHIN, J.**

In my view, the superior court was correct.  I would deny the instant writ petition.

The 2014 amendment to Elections Code section 9002 (section 9002) was a legislative reform designed to improve the initiative process.  This case sets the precedent establishing whether that section can function as a true reform to achieve its intended purpose, or if it is an empty shell — just another rule that can easily be evaded with a little imagination.

As amended, section 9002, subdivision (a), requires a 30-day period of public review of all proposed initiative measures, during which time the public may make written comments to be transmitted to the measure's proponents. Section 9002, subdivision (b), provides that during this "public review period, the proponents of the proposed initiative measure may submit amendments to the measure that are reasonably germane to the theme, purpose, or subject of the initiative measure as originally proposed."  The "reasonably germane" language is taken from cases interpreting the single subject rule.  (See *Californians for an Open Primary v. McPherson* (2006) 38 Cal.4th 735, 764.)  I agree with the majority that this court has interpreted the term broadly when deciding whether an initiative measure satisfies the single subject rule.  But that does not mean the Legislature intended the same broad interpretation in this context.  In amending section 9002, the Legislature did not merely incorporate the single subject rule.

1

We do not have to look far to find the legislative intent behind section 9002. The Legislature itself stated its intent in the bill that led to the amendment. As enacted, the bill stated the Legislature's intent to do, among other things, the following: "Identify[ing] and correct[ing] flaws in an initiative measure before it appears on the ballot. Currently, proponents of an initiative measure have few options to correct the language of an initiative measure or to withdraw a petition for a proposed initiative measure, even when flaws are identified. This act would give voters an opportunity to comment on an initiative measure before the petition is circulated for signatures. Public comment may address perceived errors in the drafting of, or perceived unintended consequences of, the proposed initiative measure." (Stats. 2014, ch. 697, § 2, subd. (b)(3).)

Thus, the Legislature intended to improve the quality of initiative measures by requiring a period of public review and permitting amendment to correct flaws that review revealed. As originally introduced, the bill permitted *any* amendment to the proposed initiative measure. (Sen. Bill No. 1253 (2013-2014 Reg. Sess.) as introduced Feb. 20, 2014, § 5.) The Legislature was concerned about this. As a bill analysis stated, "this bill does not place any limitation on the amendments submitted by the proponents. Consequently, this bill does not prevent a proponent from receiving public comments on the text of a 'spot' initiative, and then submitting a substantially revised initiative text to the [Attorney General] after the 30 day public comment period for the ballot title and summary preparation. *This scenario renders the public review process meaningless.*" (Assem. Com. on Elections & Redistricting, Analysis of Sen. Bill No. 1253 (2013-2014 Reg. Sess.) as amended June 17, 2014, p. 10, italics added.)

It should be obvious the Legislature intended the public review process to be meaningful, not meaningless. It added the "reasonably germane" limitation to ensure that it would be meaningful. Consistent with this Legislative intent, we

2

must interpret section 9002, subdivision (b) in a way that makes the review process meaningful rather than something easily evaded.

The same bill analysis expressed another concern that the "reasonably germane" language was also intended to obviate. "Furthermore, because this bill does not prevent the submission of a 'spot' initiative, the time period that the Legislative Analyst and [Department of Finance] have to prepare the fiscal estimate could be negatively impacted. This bill, which extends the time for the [Department of Finance] and the Legislative Analyst to prepare the fiscal estimate from 25 working days to 50 days, also permits the proponents to submit amendments 5 days after the 30 day public review period. As a result, if the proponents submit an amendment that substantively changes the initiative text, the [Department of Finance] and Legislative Analyst will only have 15 days to prepare a new fiscal estimate." (Assem. Com. on Elections & Redistricting, Analysis of Sen. Bill No. 1253, *supra*, p. 10.) The Legislature was thus concerned that the fiscal analysis be afforded adequate time.

As even the majority recognizes, "the Legislature intended to improve the initiative process by allowing members of the public to make suggestions to proponents . . . ." (Maj. opn., *ante*, at p. 13.) In this way, the Legislature enacted the comment period to benefit the *public*, and not merely the initiative's proponents. The Legislature made the public comment period *mandatory*, not optional. The reason is clear. The Legislature wanted to improve the final product. It wanted to permit the public to point out obvious, and not so obvious, flaws in a measure's drafting so the proponents could correct those flaws before the measure was irrevocably placed on the ballot.

When he signed the amendment to section 9002 into law, the Governor made clear it was intended to benefit the public and not merely proponents of initiative measures. He issued a press release saying that he signed it "to increase

3

public participation in the initiative process and provide better information to voters on ballot measures.  [¶]  'California's century-old initiative process is a hallmark of our electoral system and today we're taking an important step to modernize and strengthen direct democracy,' said Governor Brown.  [¶]  . . .  The measure introduces a 30-day public review period at the beginning of the initiative process.  Proponents can amend the initiative in response to public input during that review period."  (Governor Edmund G. Brown, press release regarding Sen. Bill No. 1253 (2013-2014 Reg. Sess.) Sept. 27, 2014.)

The same press release quoted the bill's supporters as saying the bill would " 'enabl[e] broader debate and public review so that measures can be modified before they go to the ballot, avoiding unintended consequences' " and would " 'give *voters* the chance to . . . address flaws if there are problems with the language.' "  (Governor Edmund G. Brown, press release regarding Sen. Bill No. 1253, *supra*, italics added.)  It quoted former Chief Justice Ronald George:  " 'Too often, ballot measures are confusing and poorly written, but there is no chance for initiative backers to make even the most routine changes.  This legislation makes common-sense improvements that will help voters understand what their votes mean and enable them to make informed decisions.' "  (*Ibid*.)

The majority observes, correctly, " 'that the initiative process occupies an important and favored status in the California constitutional scheme,' " and we must "guard the people's right to exercise the initiative power."  (Maj. opn., *ante*, at p. 20.)  But this observation does not mean the initiative process cannot be improved.  Exercising its constitutional responsibility to "provide the manner in which petitions shall be circulated, presented, and certified, and measures submitted to the electors" (Cal. Const., art. II, § 10, subd. (e)), the Legislature amended section 9002 to do just that.  Nor does this observation mean that a statute like section 9002 that is designed to improve the process should be given a

4

crabbed interpretation that defeats its purpose. In no way does enforcing section 9002 to achieve its purpose diminish the important and favored status the initiative process occupies in our constitutional scheme. It just makes the process work better. Proponents of measures may still circulate what they want. They merely have to provide enough lead time to do so consistent with legal and practical requirements, including section 9002. The proponents of the measure at issue here inform us they did not have enough time to submit the proposed constitutional amendment for public comment. But that is their doing, not the Legislature's.

Initiative proponents should not be permitted to defeat statutory requirements by submitting for public review a measure vaguely similar to what is ultimately intended, then on day 34 or so, finally showing their hand by substituting something dramatically different, something that will never receive the mandatory public review.

I now turn to the initiative measure at issue here. Certainly, some of the amendments are reasonably germane to the original measure. Some simply eliminate many of the changes in the law concerning juveniles included in the original proposal. But the newly proposed constitutional amendment — the centerpiece of the new initiative measure — is not reasonably germane. It would work a major change in California's constitutional form unrelated to the original measure.[1] Under the majority's holding, that constitutional amendment will never

---

[1] The amended initiative measure was retitled "The Public Safety and Rehabilitation Act of 2016" (amended measure). Section 3 of that amended measure would add section 32 to article I of the California Constitution (article I, proposed section 32) to read: "(a) The following provisions are hereby enacted to enhance public safety, improve rehabilitation, and avoid the release of prisoners by federal court order, notwithstanding anything in this article or any other provision of law:

*(Footnote continued on next page.)*

5

receive public comment or the opportunity to amend to correct drafting flaws. But it is entirely different from the original measure.

I must admit the previous sentence is a slight — a very slight — overstatement. Vague similarities exist between the new proposed constitutional provision and the original measure. Both involve the criminal justice system in the broadest sense — the original measure concerned juvenile and, to a lesser extent, youthful offenders; the constitutional amendment concerns mostly adult offenders. To some extent, both involve the potential release of inmates, although in very different ways. To some extent, both involve parole, although in very different ways. But there the similarity ends.

The stated reason for the newly proposed constitutional amendment — "to enhance public safety, improve rehabilitation, and avoid the release of prisoners by federal court order" (amended measure, § 3, adding art. I, proposed § 32, subd. (a)) — has nothing to do with juveniles, meaning it has nothing to do with the original measure's juvenile focus.

---

*(Footnote continued from previous page.)*

"(1) Parole consideration: Any person convicted of a non-violent felony offense and sentenced to state prison shall be eligible for parole consideration after completing the full term for his or her primary offense.

"(A) For purposes of this section only, the full term for the primary offense means the longest term of imprisonment imposed by the court for any offense, excluding the imposition of an enhancement, consecutive sentence, or alternative sentence.

"(2) Credit Earning: The Department of Corrections and Rehabilitation shall have authority to award credits earned for good behavior and approved rehabilitative or educational achievements.

"(b) The Department of Corrections and Rehabilitation shall adopt regulations in furtherance of these provisions, and the Secretary of the Department of Corrections and Rehabilitation shall certify that these regulations protect and enhance public safety." (Amended measure, § 3.)

6

Dramatically changing the sentencing laws — by permitting early parole for some offenders, contrary to the detailed sentencing scheme currently in effect — is not reasonably germane to changing the treatment of juvenile and youthful offenders in the criminal justice system.  Supposedly avoiding the release of prisoners by federal court order — the purpose the proponents stress in their argument that the measure must qualify for the 2016 ballot — has nothing to do with the original measure.

The constitutional amendment would also give the Department of Corrections and Rehabilitation (department) constitutional authority to award behavior and other credits.  The Legislature has already enacted detailed mandatory provisions for the department to award conduct and participation credits.  (See Pen. Code, § 2931 et seq.)  But the amended measure's proposed constitutional language is permissive.  Presumably, authority to award credits includes authority *not* to award credits or to award lower credits than the statutes currently require.  Because the Constitution prevails over mere statutes, it appears the proposed constitutional amendment would displace the current statutory provisions for credits and shift authority over such credits from the legislative to the executive branch of government.

For the moment, I will assume that altering the balance of power between the two branches of government in this way would not be an impermissible constitutional *revision*.  (Cf. *Legislature v. Eu* (1991) 54 Cal.3d 492, 509 [finding a 1990 initiative imposing term limits on members of the Legislature was not invalid, as a procedurally defective constitutional revision, because "[n]o legislative power is diminished or delegated to other persons or agencies.  The relationships between the three governmental branches, and their respective powers, remain untouched."].)  But shifting power from one branch of government

to another is not reasonably germane to the original measure, which left the separation of powers between the branches of government unchanged.

The new constitutional provision would also have an entirely different, and obviously complex, fiscal impact that warrants careful study. Whatever work was done on the fiscal analysis of the original measure would be useless in analyzing the fiscal impact of the proposed constitutional amendment; those responsible for that analysis would have to start from the beginning. The amendment would require at least thousands of new parole hearings, and would presumably require such hearings to be regularly conducted at intervals yet to be determined. Regulations would have to be adopted. Some unknown number of inmates would be released. All this suggests that the 50-day period under section 9002 for the joint fiscal analysis of the new measure should not be reduced to 16 days, as it was here.

I agree with the majority "that the Legislature intended the comment period to facilitate feedback, not to create a broad public forum," and that the "avenue for public comment" runs "for only one round of suggestions." (Maj. opn., *ante*, at pp. 2, 16.) But the Legislature did intend to facilitate feedback and to permit one round of suggestions. The proposed constitutional amendment — the main part of the new proposal — has received *no* feedback and *no* round of suggestions. If the court overturns the superior court's order, it never will receive such comment and cannot be amended.

But the proposed constitutional amendment is exactly the sort of measure that would greatly benefit from public comment and the opportunity to make amendments. Disregarding its merits, public comment could easily expose its drafting flaws. For example:

(1) It seems odd to embed permanently in the California Constitution a reference to a potential "federal court order" in an unnamed piece of litigation.

8

(Amended measure, § 3, adding art. I, proposed § 32, subd. (a).) It is also redundant, as this purpose is already referenced in a preceding portion of the new initiative measure, where it more logically belongs. (Amended initiative measure, § 2, par. 3 [one purpose of the measure is to "Prevent federal courts from indiscriminately releasing prisoners"].)

(2) It seems particularly odd, and pointless, to conclude a statement of *purpose* with the language, "notwithstanding anything in this article or any other provision of law." (Amended measure, § 3, adding art. I, proposed § 32, subd. (a).)

(3) More substantively, the constitutional provision never defines the term "non-violent felony offense." Because the United States Supreme Court recently declared unconstitutional as impermissibly vague the term "violent felony" in a federal statute (*Johnson v. U.S.* (2015) __ U.S. __ [135 S.Ct. 2551]), the absence of a definition is troublesome, to say the least. The Penal Code contains various lists of crimes satisfying various definitions, including a list of "violent" felonies. (Pen. Code, § 667.5, subd. (c).) Does that statute apply to mean that any crime not listed in it would be a nonviolent felony, even though many such crimes are arguably violent? Can a statute define a constitutional term? What if the Legislature amends the list? What happens if the term "non-violent felony offense" is also found to be void for vagueness? Would that mean all inmates would be eligible for parole? The amended measure could greatly benefit from a definition of the term. Adding such a definition would be possible if the proposal were submitted for public review, but it is impossible under the majority's holding.

(4) The sentencing laws currently in effect refer to a "principal term" and a "subordinate term." (E.g., Pen. Code, § 1170.1, subd. (a).) Because the proposed constitutional provision does define "full term for the primary offense" (amended

9

measure, § 3, adding art. I, proposed § 32, subd. (a)(1)(A)), it appears that what is meant is the equivalent of the "principal term." If so, it might be better to use the same terminology — which has an established meaning — rather than a new term that might suggest something different is intended. Or if, against appearances, "full term for the primary offense" means something different than "principal term," the difference should be identified.

(5) The proposed constitutional amendment gives the department "authority to award credits earned for good behavior and approved rehabilitative or educational achievements." (Amended measure, § 3, adding art. I, proposed § 32, subd. (a)(2).) But it does not explain how this new, apparently permissive constitutional provision would interact with the detailed, mandatory provisions for credits the Legislature has enacted. As I have already discussed, the constitutional provision would seem to displace the statutory scheme. But I am not sure that is the intent. Displacing the statutory credit scheme might be one of the measure's "unintended consequences" the Legislature sought to avoid in amending section 9002. (Stats. 2014, ch. 697, § 2, subd. (b)(3).) If something else is intended — perhaps that any credits the department awards under its new constitutional authority would be in addition to, rather than instead of, the statutory credits — the measure should so explain.

(6) Finally, there is a technical flaw. California Constitution, article I, proposed section 32, has a subdivision (a)(1)(A), but no subdivision (a)(1)(B). Most people are aware that one cannot subdivide something into one part. Public comment and amendment could easily avoid the embarrassment of having the California Constitution contain such a purported subdivision.

Concluding, as I do, that the proposed constitutional amendment is not reasonably germane to the original measure would not significantly hinder the initiative process. It would merely mean that a new measure that is unlike any

10

already proposed would, *for the first time*, be subject to public comment for 30 days and be amendable if drafting errors and any other flaws are uncovered during that review.

Here, for example, if the proponents were to amend the proposed constitutional provision after the public review process to correct some of the problems identified above, or others revealed in the process, the changes would clearly be germane to the original proposal, and no new review process would be required. But an entirely new, and major, change, such as the proposed constitutional amendment in this case, should not be removed from the process of review and possible amendment. Voters who might agree in principle with an initiative measure should not have to choose between voting for the measure even though it was poorly drafted, or voting against the measure because it was poorly drafted. The Legislature amended section 9002 in 2014 to avoid such a dilemma. It sought to increase the likelihood an initiative measure would be well drafted, so the voters would only have to be concerned with its merits. But for the amendment to section 9002 to function as intended, a new measure that, as a practical matter, is utterly unlike the original, must be subjected to public comment and possible amendment.

Unfortunately, this case has now set the precedent. Under today's ruling, future initiative proponents can evade the period of public review in the same way the proponents have done here. They merely need to hijack a vaguely similar measure that was in the process of qualifying. But the Legislature never intended section 9002's mandatory provisions to be so easily evaded. It intended to require a meaningful period of public comment.

Accordingly, I dissent.

CHIN, J.

11

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Brown v. Superior Court

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S232642
**Date Filed:** June 6, 2016

_____

**Court:** Superior
**County:** Sacramento
**Judge:** Shelleyanne Chang

_____

**Counsel:**

Remcho, Johansen & Purcell, Robin B. Johansen and James C. Harrison for Petitioners.

No appearance for Respondent.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Constance L. LeLouis, Jennifer A. Lee and Paul Stein, Deputy Attorneys General, for Real Party in Interest Attorney General.

Bell, McAndrews & Hiltachk, Thomas W. Hiltachk, Brian T. Hildreth and Terry J. Martin for Real Parties in Interest California District Attorneys Association and Anne Marie Schubert.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James C. Harrison
Remcho, Johansen & Purcell
201 Dolores Avenue
San Leandro, CA  94577
(510) 346-6200

Paul Stein
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-1382